Filed 7/26/22 P. v. Rodriguez CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C086389 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF171035) |
| v. | |
| ELMER DAVID RODRIGUEZ, | |
| Defendant and Appellant. | |

Defendant Elmer David Rodriguez attacked his girlfriend repeatedly and brutally. A jury found him guilty of torture, forcible rape, forcible sodomy, forcible oral copulation, numerous counts of corporal injury, dissuading a witness, criminal threats, and vandalism.

1

On appeal, defendant raises claims of evidentiary error, instructional error, prosecutorial misconduct, insufficiency of the evidence, error in denying his request to hire private counsel, and sentencing error.

We direct the matter be remanded solely for the trial court to stay two counts of corporal injury, vacate a post-trial protective order, consider whether to impose a sentence for a serious felony prior, and consider resentencing defendant on the counts of forcible sodomy, forcible rape, and forcible oral copulation. In all other respects, we affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

### Relationship history

Deanna N. met defendant at church in 2011. She was 17 years old; he was 19. They became friends and spent time together hanging out, playing basketball, and going out to eat. They began dating during Deanna's senior year in high school. It was fun and adventurous. Defendant took Deanna "outside of [her] bubble," referring to the religious environment in which she had been raised. They began having sex on her 18th birthday and began using marijuana together. Deanna felt like she had someone she could do anything with and "had no complaints." They eventually expressed their love to each other.

After about a year, defendant began saying things that hurt Deanna. He told her she was not smart because she would get lost driving around town. He insulted her intelligence, saying he deserved someone smarter than her. Deanna would "talk smack back to him," and things would escalate. Defendant would yell and lock her out of the room during arguments. Later, defendant accused her of "leeching off of him;" he was working and going to school and she was not. They would argue for hours.

Their first physical confrontation happened while they were driving. Defendant was insulting her intelligence, so she slapped his glasses off his face. He slapped her or

2

backhanded her and gave her a bloody nose. He apologized to her. The hit scarred her nose.

An argument on December 3, 2012, became physical. Deanna damaged defendant's car key, and they began arguing about it outside at the bottom of cement stairs to his family's apartment. Defendant grabbed Deanna's foot and tried to take off her shoes which he had given her as an early Christmas present. Deanna fell. She tried to kick defendant in the face, but he was able to take off one of her shoes. She ran up into his apartment to gather her things to leave. Defendant followed her into the apartment and slapped her in the face. She started bleeding from her nose, and she went into the bathroom to wash her face.

Deanna locked the door, but defendant was able to open it. He came inside the bathroom and told Deanna to take a shower. She refused. He grabbed her hair and again told her to take a shower. Deanna again refused. Defendant grabbed a brush and hit her on the head with it. He left the room, and Deanna showered.

The police arrived, and they asked Deanna if she wanted defendant arrested. She did not because she cared for him and did not think it was necessary. They nonetheless arrested him. The arresting officer testified that while he was there, Deanna told him she overhead defendant tell his mother, "Fine, call the police. If I'm going to go to jail, I'm going to hurt her good." Defendant pleaded no contest to one count of misdemeanor battery and was sentenced to probation.

The two had few contacts after this incident for a number of months until Deanna began contacting him. She had started school and a job in autumn 2013, and she let him know she was interested in seeing him. They socialized and resumed their sexual relationship. In 2014, Deanna learned that defendant was seeing a woman by the name of Michelle, but she continued seeing defendant. In October of that year, she also began dating a man named Charley, but that relationship ended when Charley learned about her ongoing relationship with defendant.

Deanna testified that defendant was incarcerated during 2015 and 2016 for beating up his friend, Alvin. Deanna visited defendant in jail and wrote him letters. They discussed the feelings they had for each other. After his release, defendant stayed with Deanna for a couple of months. They continued their sexual relationship. She became pregnant and later terminated the pregnancy. She asked him to leave in July 2016 after learning he was being dropped off at her apartment by different women. While they had been seeing each other, defendant was physically abusive. He would punch Deanna in the arm or leg, leaving a bruise. After he left her apartment, Deanna learned defendant had a girlfriend named Vanessa and was having sex with other women.

In August 2016, Deanna and her mother were changing the locks on Deanna's apartment because Deanna had given defendant a key. Defendant showed up and they got into an argument. Defendant stole Deanna's bong. While Deanna tried fighting for it, defendant spit in her face.

During this time, Deanna and Charley had maintained an on-again, off-again relationship. He moved to Los Angeles in September, and she considered moving there. But around Thanksgiving, defendant sent Deanna an e-mail expressing his feelings for her and that he loved her. Hearing what she had always wanted to hear from defendant, Deanna decided not to move and arranged to meet with defendant to talk about the e-mail.

When they met, Deanna told defendant she was not moving. He asked if she had had sex recently with Charley. She said she had, but she had ended that relationship and wanted to make things work with defendant on a more serious level. In response, defendant said he could not stay with her. He felt betrayed because she had always told him she would be faithful to him. Nonetheless, they decided to try to have a relationship again. They spent time together, including having sex. In messages and through voice mail, defendant told Deanna things such as he wanted to be with her, but when she wanted him to say those things to her in person, he would not.

4

In December 2016, Deanna learned she was pregnant. Defendant resumed physically abusing her. When she spoke with defendant about going to a clinic for a consultation about the pregnancy, defendant expressed concern about letting medical personnel examine her body. At the time, her legs were bruised from arguments with defendant which had become physical.

The physical abuse increased in January 2017. Defendant asked Deanna how many people she had slept with and how many times she had slept with Charley. He did not believe she was being honest. She gave him the answers she thought he wanted to hear, but she was not consistent with her answers. He slapped her or punched her until he was content with her answer.

January 10, 2017, incident

Defendant house-sat for a friend in January 2017. On or about January 10, 2017, while Deanna was visiting him there, defendant followed her into the bathroom. He asked her if she thought he was stupid, if she was being honest with him, and to tell him everything she had done with Charley. She tried answering his questions, but defendant slapped her in the face when she answered.

Deanna told defendant she needed to use the restroom, but defendant did not allow her to use the toilet. She urinated on herself and made a mess. Defendant made her clean up her urine with her clothes and her hair. She removed her wet clothes and laid on the floor in her urine. Defendant made her lick the urine off the floor.

Defendant kept asking Deanna questions about what she had done sexually with Charley, and specifically whether they had engaged in anal sex. She said they had not. Defendant kept interrogating her, slapping her in the face, and hitting her "everywhere." She stood up, but he slapped her face, chest, arms, and legs until she was too scared to stand. She laid back down with her belly on the floor. Defendant had anal intercourse with her there. While he did, he hit her once on her head. Her head hit the floor, splitting

5

her eyebrow. Deanna told him she did not want to "do this," but he said he did not care. After, in addition to the cut eyebrow, Deanna had bruises on her arms and chest.

January 24-25, 2017, incident

Defendant went to Deanna's apartment on January 24, 2017. At that time, defendant's half brother, J.C., had become friends with Deanna and was staying at her and her roommate's apartment. Deanna met defendant outside her apartment in the hallway. Defendant asked her how many people she had been with while he was in jail. Deanna repeated she had been with Charley only.

Defendant banged on the apartment door, and J.C. came out. Defendant asked J.C. how many people he had seen with Deanna. Contrary to what Deanna had said, J.C. said he had seen Deanna with two people since defendant had been gone. Deanna admitted that in addition to Charley, she had been with another man a year prior. Defendant was angry. He told Deanna she was his for the next two days.

Defendant instructed Deanna to leave her car at her apartment; they would take his car to his apartment. Along the way, Deanna explained she had not been honest because she wanted him to think she was loyal to him. Defendant constantly slapped her in the face. At some point, he grabbed Deanna's cell phone and broke it.

At defendant's apartment, defendant continued asking Deanna why she was lying to him and whether there had been anyone else. She denied there had been others. Defendant told her to step into the bathroom connected to his bedroom and get inside the shower. Fearing he was going to urinate on her, she asked if she could take off her clothes. He said she could. Naked, she kneeled in the shower, and defendant urinated all over her, including in her mouth and telling her to swallow it.

Defendant then asked Deanna to close her eyes and put her hands in the air. Crying, Deanna asked why he was making her do this. He told her to do what she was

told. She complied, and even though she was pregnant, he kicked her in her ribs and abdomen three times. She could not breathe while he attacked her.

Deanna showered, and the cycle resumed of his asking her questions and then slapping her in the face after she answered. She cowered while trying to block his hits with her hands. Defendant grabbed her hands, held them to her waist, and slapped her. Somehow, she ended up back in his bedroom. He got her onto the floor, still naked, and he stepped on her chest and her neck with his shoes on. She tried to wedge her hand between her neck and his shoe, but she was hyperventilating. She lost consciousness.

When she awoke, she was wet, and no one was in the room. Defendant walked in. He told her she had passed out and started convulsing so he splashed her with water to wake her up. She was "freaking out," and defendant told her to be quiet. She sat on the bed while he began the cycle of questions again.

He grabbed a lighter and asked her where she wanted to get burned. She did not answer. He lit the lighter, pressed it against her chest, and asked her again where she wanted the lighter. She pointed to the back of her thigh because she knew no one would be able to see it there. He turned the lighter on and burned her thigh for a few seconds. She yelled, and he told her to be quiet. Eventually, he brought her some ice packs, and she went to sleep.

The next morning, January 25, Deanna missed work so she could heal. She had bruises along her arms, chest, and ribs. Her face was swollen. She went with defendant to his work. The cycle of questions, answers, and physical abuse continued there. Defendant slapped Deanna mostly in the face, but he also struck and kicked her arms and legs several times and kneed her in her thighs and stomach. When she did not answer several questions, he struck her on her thighs, hips, and arms with the side of a hammer. He called her a liar and a whore and said the hammer "isn't going to get tired." He eventually stopped. They spent that night together at Deanna's apartment.

7

<u>February 14, 2017, incident</u>

About two weeks before Valentine's Day, 2017, defendant and Deanna made a deal with each other. Deanna would pay defendant $100 from her weekly paychecks to stop him from physically abusing her. They also agreed that she would be loyal to him, and that they would continue their sexual relationship until he got serious with Vanessa. She agreed not to interfere with that relationship. After making the deal, Deanna twice paid defendant $100.

On February 14, 2017, defendant asked Deanna what she did the prior Valentine's Day while he was in jail. She said she had spent the day with Charley. She initially said she and Charley had sex that day, but then she corrected herself and said there was no way they had sex. Defendant slapped her on her mouth, breaking and swelling her lip.

That evening, the two went to defendant's anger management class. Deanna waited for defendant in his car. After the class, they went to defendant's workplace. Defendant continued the cycle of asking Deanna questions about what she did the previous Valentine's Day with Charley and slapping her when she answered. Deanna used her arms and legs to defend herself, and then started kicking back. She would fall and get up, and he would knock her down by punching her in the leg, kneeing her in the stomach, or hitting her in the chest. When she did not get back up, defendant kicked her "from head to toe." He kicked her ribs and stomped on her chest. She used her legs to cover her chest, but he kicked them so she could not move them anymore.

The attack lasted for over an hour. Deanna begged him to stop, but he refused. He said, "Happy Valentine's Day," and that she deserved what he was doing to her. At one point, she said she could not take it anymore. Defendant said he was going to break her and split her face open.

The attack ended because defendant had a prior engagement with Vanessa. He pulled Deanna up from the ground with her hair. He pointed to some flowers in the

8

room.  He said they were supposed to be for her, but she did not deserve them.  He took the flowers along with Deanna's car keys and left, locking the door behind him.  Deanna had no way to unlock the office door.  Too embarrassed to call anyone, she watched a movie and fell asleep.  Defendant returned a few hours later and took Deanna to his apartment.

### February 17, 2017, incident

Three days later, on February 17, 2017, Deanna met defendant at his workplace. Earlier that day, he texted her to hurry because he wanted "my blowie," referring to oral sex.  She replied, "I'm not even off work yet."  Defendant wrote back, "so what?  I want I'm just telling you to hurry lol."

At defendant's workplace, Deanna orally copulated defendant.  She agreed to do it because it was "the easier thing to do" than to have to argue with him.  Her teeth kept scraping him.  Her mouth was so sore from the Valentine's Day beating, she could barely open it.  Each time it happened, defendant slapped her in the face.  He said she could do it better and demeaned her for being with other men.  Even when she performed better, he slapped her in the face.  He ejaculated.

Defendant told Deanna he wanted to have sex with her.  Deanna said she was worried about not being able to have sex because she was "so messed up," she could not think of a way she could possibly be comfortable.  She was sore and had so many bruises, she worried that having sex would hurt her.  Defendant told her she would just lay on her back.  He gave her a sweater to put underneath her, and they had sex.  She told him her body hurt and she "wasn't down" for it.  Defendant did not care, and he kept having sex with her.  Deanna was "so willing to follow through."  She just wanted to be comfortable to make it easier on herself.

Afterward, defendant asked Deanna what she was doing the next day. She showed him texts between her, her mother, and her aunt making plans for the day, but in the

9

process, defendant saw a name in her phone that matched the name of someone with whom he knew she had been intimate in the past. That started a "repeat of Valentine's Day"; a chain-reaction of questioning and stomping and kicking her in the same areas of her body.

Reporting and injuries

The following day, February 18, 2017, Deanna's roommate drove Deanna to the hospital. Deanna gave a statement to the medical staff explaining everything that had happened and that defendant was the person who had harmed her. She told staff she was not vaginally raped. Staff asked to test her with a rape kit, but she did not want them touching her anywhere below her waist.

Police Officer Samuel Gee interviewed Deanna that evening at the hospital. Deanna told him that defendant caused her injuries and that she was concerned for her safety. Officer Gee observed her injuries and photographed them. The photographs were shown to the jury.

Deanna presented with extensive injuries: bruising, abrasions, and redness under her eyes and on her cheekbones, shoulders, arms, chest, back, ribcage area, thighs, shins, calves, feet, and hands; a gash on her right forearm; burn scars; and a scar on her right eyebrow. She also had six fractured ribs and a bruised left kidney. While at the hospital, she terminated her pregnancy.

Deanna informed a detective that a few weeks prior, she told defendant that he made her feel like he enjoyed hurting her. Defendant agreed that he did. Defendant would look at the injuries on her body and act like he was proud of what he had done.

Defendant never explicitly told Deanna not to report what was happening to the police. Nevertheless, from comments defendant made, she understood that he did not want people to see the injuries he had inflicted on her.

10

Deanna told the detective that one of the reasons she stayed with defendant was because she was afraid of what he might do to her family. Sometime between November 2016 and February 2017, defendant told Deanna that if she ever tried to disappear, he had her sister's social security number. Deanna had no idea how that would work, but at the time, the statement "freaked [her] out." She thought a person could track someone down with the other person's social security number. Deanna also showed her roommate a text message from defendant stating he knew Deanna's sister's social security number, and if Deanna ever tried to leave, he would hurt her family.

Once during that same time period, while Deanna and defendant had been watching horror movies, defendant said that sulfuric acid could dissolve everything but teeth, and that he could not be charged with a crime if her body was not found. Deanna thought these comments were dark, but she did not take them as threats.

### Other evidence

Michelle, another of defendant's girlfriends, Alvin, a victim of an assault by defendant, and J.C., defendant's half brother, testified at trial. We will discuss their testimony below.

### Verdict

A jury found defendant guilty on numerous counts. On count 1, the jury found defendant guilty of torture on or between February 14 and February 17, 2017. (Pen. Code, § 206 (statutory section citations that follow are to the Penal Code unless stated otherwise).)

For the January 10, 2017 incident, the jury found defendant guilty of sodomy by force and willful corporal injury on a person with whom defendant had a dating relationship (counts 2, 3). (§§ 286, subd. (c)(2); 273.5, subd. (a).) The jury found true that defendant had previously been convicted of willful corporal injury. (§ 273.5, subd. (f)(1).)

11

For the January 24-25, 2017 incident, the jury found defendant guilty of four counts of willful corporal injury and one count each of misdemeanor battery and felony vandalism (counts 4, 5, 6 (battery), 7, 8, 11 (vandalism)). (§§ 273.5, subd. (a); 243, subd. (e)(1); 594, subd. (a), (b)(1).) The jury found true as to counts 4, 5, and 7 that defendant had been previously convicted of the same offense. (§ 273.5, subd. (f)(1).) Also as to count 5, the jury found true that defendant inflicted great bodily injury. (§ 12022.7, subd. (e).) As to count 8, the jury found true that defendant personally used a dangerous or deadly weapon, a hammer. (§ 12022, subd. (b)(1).)

In addition to torture, as to the February 14, 2017 incident, the jury found defendant guilty of willful corporal injury, with true findings of causing great bodily injury and a prior conviction of the same offense (count 18). (§§ 273.5, subd. (a), (f)(1); 12022.7, subd. (e).)

As to the February 17, 2017 incident, the jury found defendant guilty of forcible rape, forcible oral copulation, and willful corporal injury (counts 21, 22, 20 respectively). (§§ 261, subd. (a)(2); former 288a, subd. (c)(2) [now 287, subd. (a), (c)(2)(A)]; 273.5, subd. (a).) The jury also found true great bodily injury and prior conviction enhancements. (§§ 273.5, subd. (f)(1); 12022.7, subd. (e).)

In addition, the jury found defendant guilty of dissuading a witness and making criminal threats (counts 12, 13). (§§ 136.1, subd. (c)(1); 422.)

In a bifurcated proceeding, the trial court found true a prior strike allegation and a prior serious felony allegation. (§ 667, subds. (a)(1), (c), (e)(1).)

Sentence

The trial court sentenced defendant to an aggregate prison term of 86 years plus 14 years to life as follows (all terms are consecutive except where noted):

12

| Count | Offense | Sentence |
|---|---|---|
| 1 | Torture | 14 years to life (minimum term doubled for strike) |
| 2 | Sodomy | 16 years (base upper term doubled) |
| 3 | Corp.Inj. | 2 years, eight months (one-third middle term doubled) |
| 4 | Corp.Inj. | 2 years, eight months (one-third middle term doubled) |
| 5 | Corp.Inj. | 4 years (one-third middle term doubled, one-third enhancement) |
| 6 | Battery | 1 year concurrent |
| 7 | Corp.Inj. | 2 years, eight months (one-third middle term doubled) |
| 8 | Corp.Inj. | 2 years, four months (one-third middle term doubled, one-third enhancement) |
| 11 | Vandal. | 1 year, four months (one-third middle term doubled) |
| 12 | Wit.Dis. | 6 years (full middle term doubled) |
| 13 | Crim.Th. | 1 year, four months (one-third middle term doubled) |
| 18 | Corp.Inj. | 4 years (one-third middle term doubled, one-third enhancement) |
| 20 | Corp.Inj. | 4 years (one-third middle term doubled, one-third enhancement) |
| 21 | Rape | 16 years (full upper term doubled) |
| 22 | Orl.Cop. | 16 years (full upper term doubled) |
| § 667(a) | | 5 years |

Included in the 86-year determinate term were two one-year sentences (one-third middle term) for defendant's violation of parole in two separate cases.

13

DISCUSSION

I

*Evidentiary Error*

Defendant contends the trial court erred by (1) admitting evidence of defendant's prior bad acts; and (2) excluding evidence of defendant's good character.

A.     Admission of prior bad acts

The trial court admitted the testimony of three other victims of defendant's violence:  former girlfriend Michelle, former friend Alvin, and half brother J.C. Defendant contends the trial court abused its discretion and violated his due process rights by admitting the evidence.  He claims the evidence was unduly prejudicial and not sufficiently similar to the offenses he committed against Deanna.

1.     The Law

In general, a court may not admit evidence of a person's character, including evidence of uncharged misconduct, to prove the person's conduct on a specific occasion. (Evid. Code, § 1101, subd. (a).)  However, the evidence may be admissible under one of several exceptions to the general rule.

Under those exceptions, evidence of prior misconduct similar to the charged misconduct is admissible to prove a relevant fact other than propensity, such as motive, intent, and identity. (Evid. Code, § 1101, subd. (b).)  Evidence of the defendant's commission of another sexual offense is admissible in a criminal action in which the defendant is accused of a sexual offense.  (Evid. Code, § 1108, subd. (a).)  And evidence of the defendant's commission of other domestic violence is admissible in a criminal action in which the defendant is accused of an offense involving domestic violence, subject to conditions not relevant here.  (Evid. Code, § 1109, subd. (a), (e).)

Evidence proffered under any of these exceptions to the general rule is inadmissible if it is unduly prejudicial under Evidence Code section 352. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404; Evid. Code, §§ 1108, subd. (a); 1109, subd. (a).) Evidence is inadmissible under Evidence Code section 352 if the court in its discretion determines that the evidence's "probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

We will review the three witnesses' testimony and determine whether the trial court abused its discretion in admitting the evidence. (*People v. Erskine* (2019) 7 Cal.5th 279, 296.)

### 2. Michelle

#### (a) Her testimony

Michelle met defendant in college, and they started dating in March 2014. The relationship was normal for a few months, but then defendant became more aggressive and started to break her personal items when they argued. Over the course of the relationship, he broke her cell phone seven or eight times.

Defendant began physically abusing Michelle by poking her chest hard. He would lie on top of her in bed and jab a finger or two into her breasts, causing bruising.

When defendant and Michelle started dating, defendant would smoke marijuana, but Michele would not. After a physical altercation, however, he would force her to smoke it. She initially would refuse, but he said, "Fucking smoke it before I slap you." She smoked it. She believed defendant wanted her to smoke it after he abused her to help with the pain.

That summer, after playing basketball outside his apartment, defendant and Michelle went up to his room. Michelle saw text messages on defendant's phone from

15

Deanna. From what defendant had told her, Michelle believed that Deanna was a former girlfriend who bugged defendant by text and e-mail because he still had her belongings. Reading the texts, she realized defendant had lied about his relationship with Deanna.

She asked defendant about the texts, the two argued, and defendant became angry. Michelle tried to sit on the bed, but defendant said she couldn't. She had to sit on the floor. Defendant "drill[ed]" her about how she was wrong. When Michelle asked for water, defendant said she could not have any because she did not deserve any. Then he drank water in front of her. This continued for about 35 minutes until he gave her some water.

In August 2014, defendant and Michelle travelled to Las Vegas. They were dressed and ready to go out for the evening, but they had an argument. Defendant poured a gallon of water all over her. She locked herself in the bathroom. When she came out, defendant pushed and threw her down. She hit the back of her head against a nightstand. Defendant said, "I didn't even mean to push you against the table. That was your fault."

While she and defendant were driving back from Las Vegas, Michelle noticed something in the road. She said, "Oh, watch out." Defendant became angry. He accused her of belittling his intelligence and making it seem like he was stupid. He grabbed some orange juice and told her to apologize or else he would pour the juice all over her. He told her to smile for the next 20 minutes until they arrived home. If she dropped her smile, he would pour the juice on her and "slap the shit out" of her. She complied.

In December 2014, defendant and Michelle traveled to San Francisco for her birthday. They were getting ready to go out. While she sat on the bed—she did not remember what the argument was about—he started hitting her with his fists in her legs, thighs, and ribs. Later that trip, defendant was driving, and they needed directions to their next destination. She pulled out her phone to find the directions, but he felt she was taking too long. He punched her hands a few times, causing bruising.

16

Michelle related numerous incidents when defendant physically abused her during their relationship. On one occasion, defendant and Michelle were working out at a park. They began arguing, and defendant made her take off her shoes. He walked away with her shoes and came back about 20 minutes later. Michelle put her shoes on, and they began walking home. They argued again, and defendant stood in front of her and started kicking her shins. She tried to back away, and rub out the pain, but that angered defendant and he continued kicking her. Finally, he stopped and told her to run home.

One time after a concert, defendant and Michelle could not find the car. Defendant became angry because she could not keep up with him. He spit in her face and walked away.

Once, when defendant and Michelle were arguing in the bathroom, he kneed her in her right leg hard. She fell to the ground and could not get up. Defendant dragged her to the shower and ran water on her. The hit left a large bruise.

During one argument in defendant's bathroom, defendant and Michelle were standing face-to-face. He pulled out a bathroom cleaner, held it up to her face, and sprayed it two or three times. She tried to cover her face, but defendant slapped away her hands and sprayed her two or three more times. He did not allow her to touch or wash her face for five minutes.

At times, defendant used items to beat Michelle. He used a belt a few times to hit her legs. He whipped her hard in her face with socks. He would twist a t-shirt and whip her. When he first started physically abusing Michelle, she would ask him to stop. Defendant either disregarded her or he became angrier. He told her she was being too loud and his family would hear her. His punches and kicks became stronger. Eventually, she quit saying "stop."

Throughout the relationship, after he had beaten Michelle, defendant would drag her to the bathroom, put her in the shower, and turn the water on. He kicked her in the legs and punched and kicked her in the side of her ribs. He put her on the floor and

17

kicked and stomped on her ribs, torso, and legs. Afterward, he dragged her to the shower and turned the water on. He left her there for 10 or 15 minutes. When he abused her, he mostly kicked and stomped on her thighs, calves, and ribs. If they were on his bed, he would punch her in the side of her ribs.

Defendant also punched Michelle in the back of her head and slapped her face. For days later, she would have large bumps on the back of her head. Once, he slapped her face so hard, he knocked her off his bed. The hit left a black eye.

Because Michelle was so bruised and battered, it hurt to lay down on a pillow or try to go to sleep. When she was bruised like that, she would stay the night at defendant's apartment. It was too hard for her to walk. She also did not want her parents seeing her in that condition, and defendant would never let her leave after he beat her.

Often, after defendant beat Michelle, he "took it upon himself" to have sex with her. She would beg him not to because it hurt just to lie down. He did not care. He had sex anyway. At times, when Michelle sensed defendant was getting angry, she would ask him to calm down. He asked her what she was going to do for him to make him feel better. She asked what he wanted her to do. He said, "Figure it out. Figure it out. Suck my dick." She would comply, and he would not hit her.

On one occasion, they both had the day off. They were on their way to Michelle's parents' house when Michelle mentioned she had found him searching online for a woman named Sydney. Defendant shook his head and said it was going to be "one of those days. . . . You just fuck[ed] this whole day up." He turned the car around. He said, "We have all day to do this," and then he struck Michelle with his fist in her chest. She felt like "the life" was taken out of her.

They drove to his apartment complex. Michelle tried to run to her car, but he grabbed her hard and put his hands over her mouth. She was crying and tried to pull away, but he dragged her upstairs to his apartment and pushed her inside his bedroom.

He punched her in the back of her head, and she fell onto the bed. "And after that, it was just him beating me. And choking me. And beating me. For what it seems like forever."

On one occasion, defendant was very angry and started beating Michelle. But this time was different. He choked her by wrapping his bicep around her neck. She was unable to breathe and was scared she would pass out. She scratched and slapped his arms to let her breathe. He let go, hit her, punched the back of her head, and then started choking her again. This happened about four times.

Then, he laid Michelle on the floor. She was wearing a dress. He grabbed a lint roller and started to put it inside her anus. Holding the roller there, he said, "You want to break up now, bitch?" He continued, "You know what, it would be fucking worth killing you. It would be so fucking worth it." He choked her with his left arm, and using his right, he inserted the tip of the roller into her anus. He asked her if she liked it and if she wanted to break up then. Crying, she was scared he would kill her.

Defendant put her head over the bed. Grabbing her hair, he shook her head back and forth in different directions. After doing this for a while, he let go of the lint roller, choked her one more time, and then let her go. He walked out of the bedroom.

Once, after beating Michelle in his bedroom, defendant picked up a lighter and started lighting it. He told her to lie on her stomach. He sat on top of her, lit the lighter, and burned the lower part of her buttocks. She screamed in pain. He got angry because she screamed. He punched her in the back of the head, told her to shut up, and continued burning her. She kept screaming, and he punched her in her ribs, arm, and head as he kept burning her. She realized he was burning his initials into her skin.

Michelle's parents grew concerned about the relationship in 2015 when they noticed Michelle had lost a lot of weight. She became scared of defendant. Anything she said would set him off. Stressed, she stopped eating much. In June 2014, she weighed approximately 143 pounds. At the end of the relationship, she weighed about 108 pounds.

Toward the end of their relationship, defendant made statements Michelle interpreted as threats. After one of her beatings, defendant said he knew where her mother, father, and her whole family lived. Yet Michelle stayed in the relationship. She deeply wanted him to fix what had happened and to love her back. At times, she confronted him in e-mails and texts about the abuse. His responses indicated he was obsessed and in love with her, and he would treat her in the "most amazing ways." However, he rarely would say those things to her in person.

In February 2015, defendant and Michelle separated for two weeks. During that time, defendant pleaded for a second chance and that he would change. She agreed to meet with him to try to make the relationship work. Less than five minutes after she sat in his car, they began arguing. She asked and begged him to take her home. He refused and drove her into the country. She begged him not to beat her, and he said he would take her home. On the way into town, she began to cry. He backhanded her with his fist.

Instead of taking her home, he took her to his apartment to beat her. She got out of the car and started running and screaming. Someone from the apartment complex said they were calling the police. She ran to some bystanders, but she became scared about the police coming. Defendant had always warned her about not calling the police, so she asked the people not to call the police. A bystander tried to keep defendant away from her, but defendant pushed the man to the ground. The man's head hit the back of a van. Ultimately, defendant walked away, and Michelle's mother picked her up.

On May 8, 2015, Michelle and her friend Paige went out drinking. Afterward, Michelle called defendant to come pick them up. They argued about it as the two women walked to Michelle's mother's car. Eventually, he came, but Paige refused to get in his car. Michelle decided to stay with Paige, and she sat inside her mother's car. Defendant dragged a key across her mother's car. Upset, Michelle got out of the car and pushed defendant. He grabbed her and threw her to the ground. She landed on her right shoulder

20

and felt severe pain. Defendant left the scene. When he did, he also took the keys to Michelle's mother's car, Michelle's purse, and her wallet.

Michelle and Paige made their way to Paige's house. Michelle called her mother, and her mother insisted she call the police. The officer asked Michelle whether defendant had hurt her. She lifted her dress and had bruising and scabbing. That was the first her mother knew about the abuse. Michelle did not report any other abuse; she was not ready to go through that. The district attorney brought charges against defendant for this incident.

Ultimately, Michelle told her mother that defendant hit her. She asked her mother to help her leave. But on July 8, 2015, two days before she moved out of state, she met defendant at his apartment. Looking through his laptop, she found text messages from a woman named Meghan. She confronted defendant about it, and he slapped her hard on the side of her face. She fell off the bed, and he beat and choked her. The next day, they met at a park. They argued, and she slapped him. He spit in her face. She moved out of state the following day.

After Michelle had moved, defendant told her that during their relationship, he had started seeing one of her coworkers. This angered and hurt Michelle. To hurt defendant back, she told him that she had slept with his friend Alvin, even though she really had not. Later, Michelle texted Alvin after hearing something had happened to him. Alvin texted back, "That n-i-g-g-a damn near ripped my ear off and fractured my face with a skateboard."

(b)     Admission of the evidence and jury instruction

The trial court admitted Michelle's testimony pursuant to Evidence Code section 1109, and it found the evidence was not inadmissible under section 352. The evidence's prejudicial impact did not substantially outweigh its probative value. Presenting the evidence (along with J.C.'s testimony) could add two or three days to what was

21

scheduled to be a seven-day trial, but in a case like this, the consumption of time would not substantially outweigh the evidence's probative value. The evidence also would not confuse the jury, as the events were different, and good instructions and good arguments would ensure the jury would not be confused.

During Michelle's testimony, the trial court instructed the jury concerning the admission and use of Michelle's testimony. Relying on CALCRIM No. 852A, the court told the jury it could consider Michelle's testimony of domestic violence only if the prosecution proved by a preponderance of the evidence that defendant in fact committed the uncharged acts. If the jury decided defendant committed the uncharged acts, it could conclude that defendant was disposed or inclined to commit domestic violence. Based on that decision, the jury could also conclude that defendant was likely to commit and did commit the charged crimes against Deanna.

The court stated that the jury's conclusion that defendant committed the uncharged acts was only one factor to consider along with the other evidence. It was not sufficient by itself to prove defendant guilty of the charged crimes. The prosecution still had to prove each charge and allegation beyond a reasonable doubt.

If the jury decided that defendant committed the uncharged acts, it could consider that evidence and weigh it together with all the other evidence to determine whether defendant committed the charged crimes. But the uncharged acts were insufficient by themselves to prove defendant committed the charged crimes, and the prosecution still had to prove each charged allegation beyond a reasonable doubt.

(c)     Analysis

Defendant contends that Michelle's testimony was prejudicially cumulative and that much of it was superfluous and irrelevant. The jurors likely convicted him for the charged crimes in order to punish him for the harm he inflicted on Michelle, for most of which he was never charged. Defendant also claims that the evidence about the abuse's

22

effect on Michelle, including her dramatic weight loss and the need to move out of state, constituted improper victim impact evidence.

When determining whether evidence to be admitted under Evidence Code section 1109 is unduly prejudicial under Evidence Code section 352, the trial court must weigh the evidence's probative value against four factors: " '(1) the inflammatory nature of the uncharged conduct; (2) the possibility of confusion of issues; (3) remoteness in time of the uncharged offenses; and (4) the amount of time involved in introducing and refuting the evidence of uncharged offenses.' [Citations.]" (*People v. Culbert* (2013) 218 Cal.App.4th 184, 192.)

The prejudice Evidence Code section 352 seeks to prevent arises from " ' " ' "evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " [Citation.]' . . . [E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." [Citation.]' [Citation.]" (*People v. Scott* (2011) 52 Cal.4th 452, 490-491.)

" ' "The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense." ' [Citation.] [Evidence Code s]ection 1109 was intended to make admissible a prior incident 'similar in character to the charged domestic violence crime, and which was committed against the victim of the charged crime or another similarly situated person.' (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 1876 (1995-1996 Reg. Sess.) June 25, 1996, p. 5 (Assembly Analysis of Senate Bill 1876).) Thus, the statute reflects the legislative judgment that in domestic violence cases, as in sex crimes, similar prior offenses are 'uniquely probative' of guilt in a later

23

accusation. [Citation.] Indeed, proponents of the bill that became [Evidence Code] section 1109 argued for admissibility of such evidence because of the 'typically repetitive nature' of domestic violence. (Assem. Analysis of Sen. Bill 1876 *supra* at pp. 6–7; [citation].)" (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531-532, fn. omitted.)

The trial court did not abuse its discretion admitting Michelle's testimony. The evidence was highly probative. Michelle's and Deanna's experiences and relationships with defendant were very similar. Both women were in sexual, romantic relationships with defendant. Both experienced similar kinds of abuse: choking, burning, stomping on the chest, kicks and punches to the torso and legs, hitting and slapping the head, and spitting in the face. Both were dragged into the shower from his bedroom. Defendant expressed the things they wanted to hear in writing, but not in person.

The evidence's highly probative nature was not substantially outweighed by the possibility of undue prejudice. While the evidence from both witnesses was upsetting, that was the nature of the case. Michelle's testimony was not unduly inflammatory, as she experienced no more serious abuse than did Deanna.

The uncharged conduct was not remote in time. It occurred in 2014 and 2015 while defendant was in a relationship with Deanna. Also, it was unlikely the jury would convict defendant in order to punish him for his offenses against Michelle. The jury learned that defendant had been prosecuted for some of his actions against her.

Michelle's testimony was lengthy. But in light of the long history of abuse defendant inflicted on Deanna and Michelle, the additional time did not substantially outweigh the evidence's probative value.

Defendant contends Michelle's testimony was cumulative. Evidence may have a lower probative value if it is merely cumulative of other evidence and there is a substantial danger of confusing or misleading the jury or a substantial danger of necessitating an undue consumption of time. (*People v. Holford* (2012) 203 Cal.App.4th 155, 178, fn. 14.) "However, ' "[e]vidence that is identical in subject matter to other

24

evidence should not be excluded as 'cumulative' when it has greater evidentiary weight or probative value." [Citation.]' [Citation.]" (*Ibid.*) Here, Michelle's testimony is identical in subject matter and has significant probative value. The evidence was not merely cumulative.

Defendant claims the evidence of Michelle's weight loss and observance of bruising by others was improper victim impact evidence. Defendant, however, did not object to the evidence at trial. This contention is forfeited. The trial court did not abuse its discretion admitting Michelle's testimony.

2.    <u>Alvin</u>

(a)    <u>His</u> <u>testimony</u>

Alvin and defendant met in 2013 at community college and became friends. On August 22, 2015, they went to a hip-hop concert at a club. Defendant started arguing with people. Alvin stepped in to prevent a fight, and the bouncer kicked them out of the club. They went home to Alvin's apartment, and defendant went next door to visit with a neighbor named Meghan.

After watching a movie, Alvin began getting ready for bed when he heard a loud bang at his door. As he walked to the door, defendant kicked the door down, severing it from the wall. Alvin asked defendant to leave, but defendant kicked Alvin's TV and stepped on his laptop. Upset, Alvin tried to guide defendant out. Defendant started punching him and Alvin fought back. Defendant hit Alvin in the head with a skateboard. Its wheels hit Alvin's cheekbone, fracturing it. Then defendant hit Alvin with a glass cup on the left side of Alvin's head over his ear. Alvin ran to the back of the apartment to hide, and he lost consciousness until medical personnel arrived. He received 28 stiches on his ear, and he declined surgery on his fractured cheekbone.

The trial court admitted Alvin's testimony pursuant to Evidence Code section 1101, subdivision (b) at the same time it admitted Michelle's testimony and found it was not unduly prejudicial under Evidence Code section 352 for the same reasons.

(b)     Analysis

Defendant argues that Alvin's testimony was inadmissible under Evidence Code section 1101, subdivision (b) because it was dissimilar to the assaults on Deanna. It did not tend to prove defendant intended to inflict cruel and unusual pain on Deanna, an element of the torture charge, because defendant was apparently drunk when he attacked Alvin. Deanna did not describe defendant as being drunk when he attacked her. The evidence of Alvin's attack also did not help to establish defendant's motive or intent when he attacked Deanna. Defendant claims the prosecutor used the evidence only to show defendant's propensity.

"As Evidence Code section 1101, subdivision (b) recognizes, that a defendant previously committed a similar crime can be circumstantial evidence tending to prove his identity, intent, and motive in the present crime. Like other circumstantial evidence, admissibility depends on the materiality of the fact sought to be proved, the tendency of the prior crime to prove the material fact, and the existence *vel non* of some other rule requiring exclusion." (*People v. Roldan* (2005) 35 Cal.4th 646, 705, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Regarding materiality, a defendant's not guilty plea puts at issue all the elements of the charged offenses, including intent. (*People v. Catlin* (2001) 26 Cal.4th 81, 146, overruled on another ground in *People v. Nelson* (2008) 43 Cal.4th 1242, 1253-1256.) Motive is not an element of a crime or an ultimate fact put at issue by the charges. However, it is an intermediate fact from which the existence of an element of the crime may be inferred. (*People v. Clark* (2021) 62 Cal.App.5th 939, 960.) For intermediate facts, " 'the materiality requirement is satisfied *only* if the intermediate fact tends

26

logically and reasonably *to prove an ultimate fact.*' ([*People v.*] *Thompson* [(1980) 27 Cal.3d 303,] 315, fn. 14, [].) Though not an ultimate fact put at issue by the charges, motive may be probative of such ultimate issues as intent, identity or commission of the criminal act itself. (*People v. Cage* (2015) 62 Cal.4th 256, 274; *People v. Megown* (2018) 28 Cal.App.5th 157, 166 [].)" (*Clark*, at p. 960.)

The degree of similarity required between the charged act and uncharged misconduct depends on the purpose for which the other act evidence is offered. (*People v. Ewoldt, supra*, 7 Cal.4th at p. 402.) A low degree of similarity is required to prove intent. (*Ibid*.) " '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' (2 Wigmore, [Evidence] (Chadbourn rev. ed. 1979) § 302, p. 241.) In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]" (*Ewoldt*, at p. 402.)

Unlike with intent, similarity between the charged offense and the uncharged misconduct is not necessarily required to admit the uncharged act to establish motive. "[T]he probativeness of other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, so long as the offenses have a direct logical nexus." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 15.)

Evidence of uncharged misconduct is admissible to establish two different types or categories of motive evidence. "In the first category, 'the uncharged act supplies the motive for the charged crime; the uncharged act is cause, and the charged crime is effect.' (1 Imwinkelried, Uncharged Misconduct Evidence [(2009)], § 3:18, p. 3-128.) 'In the second category, the uncharged act evidences the existence of a motive, but the act does not supply the motive. . . . [T]he motive is the cause, and both the charged and

27

uncharged acts are effects. *Both crimes are explainable as a result of the same motive.*' (*Id.* at pp. 3-128 to 3-129, fns. omitted, italics added.) [¶] California case law allows the admission of other crimes evidence to prove this second kind of motive." (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1381.)

The trial court did not abuse its discretion admitting Alvin's testimony. It was admissible under Evidence Code section 1101, subdivision (b) to establish motive, which in turn was relevant to establishing defendant's intent to torture Deanna. Defendant's motive in viciously attacking Alvin and Deanna in many instances was revenge. The jury could reasonably believe defendant was jealous anytime he learned or believed Deanna had sexual relations with someone other than himself, and he exacted his revenge by intentionally inflicting cruel and unusual pain and suffering on her for her betrayal. (See § 206.) His motive for attacking Alvin was the same. Upon learning (falsely) that Alvin had been with Michelle, defendant exacted revenge from Alvin for his betrayal of their friendship. He attacked Alvin, hit him in the head with a skateboard, breaking his cheekbone, and hit him in the head with a glass cup, leaving a laceration over Alvin's ear that required 28 stiches and left Alvin unconscious. In each instance, defendant's motive was revenge.

The offenses have a direct, logical nexus, and defendant's intent to seek revenge is the cause of the attacks against both persons. Given the direct connection between the attacks, the evidence of defendant's attack on Alvin tends logically and reasonably to prove that his attacks on Deanna were no accident or acts in self-defense; they were acts taken with the specific intent to cause cruel or extreme pain and suffering for the purpose of revenge.

The trial court did not err in admitting Alvin's testimony.

3.    <u>J.C.</u>

(a)    <u>His</u> <u>testimony</u>

J.C. is defendant's younger half brother. They met over Facebook when J.C. was 17 years old, and over time they developed a relationship. After first meeting defendant, J.C. met Deanna. They worked for the same employer and became friends.

In May 2016, J.C. moved in with Deanna and her roommate. Defendant moved in with them after he was released from jail. Defendant learned that J.C. was gay. At a restaurant, defendant pestered J.C. with questions about his sexuality in a way that left J.C. feeling that defendant was "not okay" with him being gay.

Defendant was eventually kicked out of Deanna's apartment. Deanna said they had decided to go their separate ways, but they began seeing each other again two or three weeks later. During December 2016, Deanna stopped by her apartment only a couple of times.

In January 2017, J.C. was lying in bed and about to go to sleep when defendant "popped out of nowhere" into the apartment. He grabbed J.C. and pinned him against the door. Defendant was "pretty pissed." He was in J.C.'s face with his hands on J.C.'s neck and chest. He called J.C. profane names and brought up a number of issues, including hitting, Deanna's abortion, and J.C.'s personal views. He yelled at J.C. and blamed him for everything that had not gone well in his life. Defendant was acting "very erratic and not there." Deanna was with defendant, and she looked like she had a "busted lip."

The three moved outside the apartment. Defendant asked J.C. what he knew about other partners Deanna may have had, including Charley. J.C. gave defendant the name of a man Deanna had been with in addition to Charley. This upset defendant. Ultimately, the conversation defused. J.C. went inside, and defendant and Deanna left together.

The trial court admitted J.C.'s testimony pursuant to Evidence Code section 1109. J.C. was sufficiently related to defendant for Evidence Code section 1109 to apply. The

29

evidence was not inadmissible under Evidence Code section 352 because it would not unduly prolong the case or cause confusion. Its prejudicial impact did not substantially outweigh its probative value.

### (b)    Analysis

Defendant argues the court abused its discretion admitting J.C.'s testimony, as the evidence was irrelevant and more prejudicial than probative. Much of J.C.'s testimony did not concern abuse. Defendant's behavior toward J.C. was so dissimilar from his actions against Deanna that J.C.'s testimony was irrelevant. It did not prove defendant battered, sexually assaulted, or tortured Deanna. Defendant also claims that the court gave no instruction limiting how the jury could consider J.C.'s testimony. The limiting instruction on domestic violence referenced only Michelle's testimony.

Because defendant is accused in this action of offenses involving domestic violence, evidence of his commission of other domestic violence during the same time period he was attacking Deanna is admissible under Evidence Code section 1109 so long as the evidence is not unduly prejudicial under section 352. (Evid. Code, § 1109, subd. (a), (e).) Defendant does not dispute that his actions against J.C. constituted domestic violence.

The trial court did not abuse its discretion in finding the evidence was not unduly prejudicial. J.C.'s testimony was relevant and probative. It tended to prove defendant had a propensity to commit domestic violence. That defendant's actions against J.C. were not identical to his actions against Deanna did not prevent the evidence from being admitted. The assault of J.C. was sufficiently similar with some of defendant's attacks on Deanna on a number of grounds to be probative. In both, defendant was angry and disgusted when presented with information he did not like or agree with, such as J.C.'s sexuality and Deanna's prior sexual relationships. In both, defendant verbally abused

30

J.C. and Deanna, calling them profanities and pestering them with questions about Deanna's sex life. In both, defendant physically abused and harmed J.C. and Deanna.

There is no requirement that the uncharged acts directly prove defendant committed the charged acts. Under Evidence Code section 1109, evidence of uncharged acts of domestic violence is admissible to show that defendant has a propensity for committing the domestic violence described by the victim. (See *People v. Cabrera* (2007) 152 Cal.App.4th 695, 705-706 [evidence properly admitted to establish propensity to commit the acts described by the victim].) The evidence does not have to establish directly that defendant committed the acts against the victim.

The evidence's probative value was not significantly outweighed by its prejudicial impact. The violence against J.C. was not more inflammatory than the violence against Deanna. His testimony would not have confused the jurors; his experiences were plainly separate from defendant's attacks against Deanna. The conduct was recent; it took place during the time period when defendant was abusing Deanna. And the presentation of J.C.'s testimony did not take a significant amount of trial time.

Defendant criticizes the trial court for not giving the jury a limiting instruction concerning J.C.'s testimony like it did for Michelle's testimony. Defendant claims this omission was exacerbated by the trial court's later statement, "Remember, if I don't limit the use of a piece of evidence presented to you, testimony or an exhibit, then there are not any limits on how you may consider it. You may give it whatever reasonable consideration you think is appropriate for it."

Defendant did not request a limiting instruction, and the trial court was not under a duty to provide one sua sponte. (*People v. Cottone* (2013) 57 Cal.4th 269, 293.) On rare occasions, a sua sponte instruction may be needed where evidence of uncharged acts is a dominant part of the evidence against the accused and is both highly prejudicial and minimally relevant to any legitimate purpose. (*People v. Collie* (1981) 30 Cal.3d 43, 64, superseded by statute on other grounds as recognized in *People v. Champion* (1995)

31

9 Cal.4th 879, 912-913.) J.C.'s testimony was not a dominant part of the prosecution's case. As a result, the lack of a limiting instruction was not error.

And, for the sake of argument, even if the court erred in not giving a limiting instruction in light of its statement that the jury could consider the evidence as it deemed appropriate, any such error was harmless. We review instructional error for a showing of prejudice under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Breverman* (1998) 19 Cal.4th 142,149.) It is not reasonably probable that defendant would have obtained a more favorable verdict had a limiting instruction been given. The uncontradicted testimony of defendant's physical and sexual abuse of Deanna and Michelle was too overwhelming for J.C.'s testimony to have changed the verdict had a limiting instruction been given. The court did not abuse its discretion admitting J.C.'s testimony.

### B. Exclusion of good character evidence

Defendant contends the trial court abused its discretion by excluding evidence he sought to admit of his good character; specifically, that he had a reputation for being a nice guy who would not treat people violently.

#### 1. Background

The prosecution filed a motion in limine to exclude character evidence defendant would seek to introduce through the testimony of two former girlfriends (Vanessa and Meghan) and three acquaintances (Zach, Mario, and Stephanie). Based on the witnesses' previous statements, the prosecutor believed the witnesses would provide improper opinion or reputation evidence. The prosecutor stated the former girlfriends would testify that defendant was never physical with them, never forced them to have sex, and that defendant was a good person who would never commit the charged crimes. The prosecutor said the three acquaintances would testify that defendant was "a nice guy," and they would relate specific incidents to vouch for defendant's character.

The prosecutor argued that the evidence was inadmissible. Evidence of specific incidents of defendant's conduct was impermissible character evidence. Also, the evidence was not proper opinion or reputation evidence. The prosecutor claimed that any character evidence had to be in the form of proper opinion evidence based on the witnesses' personal observations. The witnesses could not make generalized statements that defendant did not beat women or that he was not sexually deviant.

At the hearing on the motion, defense counsel argued that the evidence should not be excluded. Counsel agreed the witnesses could not opine on whether defendant committed the charged crimes. But the former girlfriends could testify as to whether defendant was a kind, generous and typical boyfriend and whether he ever hurt or forced them or was aggressive with them. Counsel claimed they could discuss their observations of him and how he treated them.

The trial court granted the in limine motion in part and denied it in part. The witnesses could testify about their own relationships with defendant and their personal observations of how defendant acted with them and with Deanna and Michelle. The witnesses could not testify generally that defendant was "a nice guy who would never hurt anybody" or "would never do anything."

2. Analysis

Defendant claims that after the prosecution presented "mountains of bad character evidence" portraying him as mean and violent, he was entitled to present evidence that he had a reputation for being a nice guy who would not treat people violently. He contends the trial court's ruling denied him that right, and the ruling was prejudicial. The evidence would have shown that defendant did not harbor the intent to inflict cruel pain, an element of torture.

Initially, the People assert that defendant has forfeited this claim because he did not lodge a specific objection to the exclusion of the challenged evidence. They claim

33

that at the hearing on the motion, defense counsel agreed with the prosecutor that reputation testimony about whether defendant was the type of person who would commit these crimes was not admissible.

Defendant did not forfeit this claim. Defense counsel opposed the in limine motion at the hearing and argued that the evidence should be admitted. Counsel conceded only that the character witnesses could not opine as to whether they believed defendant committed or would commit the crimes, and defendant does not contradict that concession here.

A defendant may introduce evidence of his or her character to show a disposition not to commit an offense. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1118, disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) Evidence Code section 1102 authorizes a defendant in a criminal action to offer evidence of his character or a character trait in the form of either an opinion (expert or lay) or evidence of his reputation to prove his conduct conformed with that character or character trait. (Evid. Code, § 1102, subd. (a).)

To be admissible, the evidence must be "relevant to the charge made against" the defendant. (Cal. Law Revision Com. com., Evid. Code, § 1102.) "Such evidence is relevant if it is inconsistent with the offense charged—e.g., honesty, when the charge is theft—and hence may support an inference that the defendant is unlikely to have committed the offense. In appropriate cases, such circumstantial evidence 'may be enough to raise a reasonable doubt in the mind of the trier of fact concerning the defendant's guilt.' ([Cal. Law Revision Com. com., [Evid. Code, ]§ 1102]; see also *Michelson v. United States* (1948) 335 U.S. 469, 476 [].)" (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1305 (*McAlpin*).)

Reputation evidence is the most commonly used method of proving character when character is relevant. " 'Character' is 'disposition,' what a person 'is'; 'reputation' is what the person is 'reputed to be.' From evidence of a bad reputation for

34

peaceableness an inference of bad character (that particular trait) can be drawn; and the same is true of good reputation and good character. [Citation.]" (1 Witkin, Cal. Evidence (5th ed. 2021), Circumstantial Evidence, § 46.) "Evidence that a defendant does *not* have a bad reputation for a relevant character trait is admissible as tending to show that he has a good reputation for that trait." (*McAlpin, supra*, 53 Cal.3d at p. 1310.)

The preferred method for proving reputation is by testimony of a witness "who has knowledge of the general reputation of the person in the place where the person lives or works, for the traits of character involved." (1 Witkin, Cal. Evidence, *supra*, Circumstantial Evidence, § 46.) The testimony does not have to be based on the witness's personal observation. (*McAlpin, supra*, 53 Cal.3d at p. 1311.) " 'Reputation is not what a character witness may *know* about defendant. Reputation is the estimation in which an individual is held; in other words, the character imputed to an individual rather than what is actually known of him either by the witness or others.' [Citation.]" (*Ibid*.)

Defendant made no offer of proof to establish that his proposed character witnesses knew of his general reputation in the community or workplace as being a non-violent, nice person. Counsel stated that Vanessa and Meghan could testify about their own relationships with defendant, that he was kind to them. The other proposed witnesses would relate their observations of defendant's and Deanna's relationship and also testify of their own relationships with defendant. But evidence of defendant's conduct in a relationship is not evidence of his reputation in the community for being a nice person. Reputation is character imputed to defendant by others, not what the witnesses actually knew of him and experienced from him. The trial court did not abuse its discretion in precluding the character witnesses from testifying of defendant's reputation.

In addition to proving good character by reputation, a defendant's character may also be established by lay opinion testimony. "The opinions of those whose personal intimacy with a person gives them firsthand knowledge of that person's character are a

far more reliable indication of that character than is reputation, which is little more than accumulated hearsay." (Cal. Law Rev. Com. com., Evid. Code, § 1102.)

Lay opinion testimony of a defendant's character trait must satisfy the requirements of Evidence Code section 800. It must be based on the witness's perception, and it must be helpful to a clear understanding of the witness's testimony. (*McAlpin, supra*, 53 Cal.3d at p. 1306.) The testimony cannot consist solely of specific instances in which defendant had the opportunity to be mean, aggressive, or violent, and he was not. Rather, the witnesses' opinion of a defendant's trait must be based on their long-term observation of defendant's consistently good behavior throughout the course of their relationship with him, and their opinion of defendant's character must arise from that experience as a whole. (*Id.* at pp. 1309-1310.)

Defense counsel's argument at trial was in effect that the proposed testimony was admissible as lay opinion testimony of defendant's character trait of being nice, generous, and non-aggressive. In his opening brief, however, defendant did not contend that the trial court's ruling violated his right to present lay opinion testimony of his character trait based on the witnesses' long-term observations of him. He raises the argument for the first time in his reply brief. Arguments raised for the first time in a reply brief are forfeited. (See *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9.)

In any event, were we to address the argument and find error, we would conclude the error was not prejudicial. The evidence of defendant's commission of the crimes was too overwhelming for the opinion testimony to have led to a more favorable verdict for defendant. Even if the witnesses testified of a good character trait, because of the strength of the undisputed evidence, including the photographic and medical evidence as well as Michelle's testimony of similar abuse, we are convinced beyond a reasonable doubt that defendant would not have received a more favorable verdict had the error not been made.

36

## II

### *Alleged Instructional Error*

Defendant claims the trial court committed instructional error when it (1) did not give a unanimity instruction sua sponte on the criminal threats charge; (2) did not instruct on forcible assault likely to produce great bodily injury as a lesser included offense of torture; (3) did not instruct on the lesser included offense of misdemeanor witness dissuasion; and (4) gave conflicting instructions on the intent element of torture.

### A.    No unanimity instruction on criminal threats count

Defendant contends the trial court erred by not giving a unanimity instruction sua sponte on the criminal threats charge (count 13). He claims an instruction was required because the prosecutor relied on different incidents that occurred at different times without electing which incident she relied upon to prove the charge.

### 1.    Background

The information's count 13 alleged that defendant made a criminal threat between December 1, 2016 and February 17, 2017. When asked if defendant had threatened her, Deanna testified that between those dates, defendant said that if she tried to disappear, he had her sister's social security number. Deanna feared he could track someone down with that person's social security number. Defendant sent Deanna a text that he knew her sister's social security number, and if Deanna ever tried to leave, he would hurt her family.

Deanna also testified that while she and defendant were watching a horror movie, defendant said that sulfuric acid can dissolve everything but teeth, and he could not be charged with a crime if her body was not found. Deanna testified that the statements did not concern her. She thought the statements were dark, but she did not take them personally as a threat that he was going to burn her with acid.

37

In closing argument, the prosecutor relied on defendant's threat about knowing the sister's social security number as the criminal threat being prosecuted. The prosecutor stated, "So the fact that he's making the mention about her sister and having that Social Security number is consistent with threatening to cause great bodily injury to Deanna and/or to someone else. The threat actually caused Deanna to be in sustained fear for her own safety or the safety of her immediate family." The prosecutor did not mention the sulfuric acid comment as being part of the criminal threats charge.

### 2.    *Analysis*

"As a general rule, when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty." (*People v. Jennings* (2010) 50 Cal.4th 616, 679 (*Jennings*).) The court has a duty to instruct sua sponte if the prosecution does not elect which act it is prosecuting. (*People v. Curry* (2007) 158 Cal.App.4th 766, 783.)

The evidence shows that the prosecutor elected the threat involving the social security card as the action being prosecuted as a criminal threat. "The prosecution can make an election by 'tying each specific count to specific criminal acts elicited from the victims' testimony'—typically in opening statement and/or closing argument. [Citations.] Such an election removes the need for a unanimity instruction. [Citation.] [¶] Under these principles, there is an implicit presumption that the jury will rely on the prosecution's election and, indeed, is bound by it." (*People v. Brown* (2017) 11 Cal.App.5th 332, 341.)

The prosecutor's election was clear. She informed the jury during oral argument in unambiguous language that the action being prosecuted was defendant's threat based on knowing Deanna's sister's social security number. The only evidence the prosecutor

discussed in arguing that the elements of the offense were established was the evidence relating to that same incident. This type of direct and clear statement qualifies as an effective election. The trial court did not err in not giving a unanimity instruction.

### B. No instruction on lesser included offense of forcible assault

Defendant contends the trial court erred by not instructing the jury sua sponte on assault with force likely to produce great bodily injury as a lesser included offense of torture. Defendant acknowledges that aggravated assault is not a lesser included offense of torture under the statutory elements test. However, he asserts the offense qualifies as a lesser included offense of torture under an "expanded accusatory pleading test" set forth in *People v. Ortega* (2015) 240 Cal.App.4th 956, 967 (*Ortega*), and that the court's omission of the assault instruction was prejudicial error.

A trial court must instruct sua sponte on any lesser included offense substantially supported by the evidence. (*People v. Breverman, supra*, 19 Cal.4th at p. 162.) In determining whether an offense is a lesser included offense we apply a de novo standard of review. (*Ortega, supra*, 240 Cal.App.4th at p. 965.)

An offense is a lesser included offense of a charged offense "if the former is necessarily included in the latter. There are two tests to determine whether this is so: (1) if all of the elements of the lesser offense are included in the elements of the greater offense, or (2) if the allegations of the pleading describe the charged offense so that it necessarily includes all the elements of the lesser offense." (*People v. Taylor* (2004) 119 Cal.App.4th 628, 642.)

We turn first to the statutory elements. Torture is committed when a person inflicts great bodily injury on another "with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose . . . ." (§ 206.) "Great bodily injury" means "a significant or substantial physical injury." (§§ 206, 12022.7.)

39

The offense of aggravated assault is "an assault upon the person of another by any means of force likely to produce great bodily injury . . . ." (§ 245, subd. (a)(4).) An assault is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.)

There is no dispute that aggravated assault is not a lesser included offense of torture under the statutory elements test. "Torture requires actual infliction of great bodily injury, but it does not require that the injury be inflicted by *any* means of force, let alone by means of force likely to produce great bodily injury. For example, a caretaker would be guilty of torturing an immobile person in his care if the caretaker, acting with the intent to cause extreme suffering for a sadistic purpose, deprived that person of food and water for an extended period of time, resulting in great bodily injury to the person. In such a circumstance, the caretaker would have inflicted great bodily injury without using any force and thus would not be guilty of committing assault by means of force likely to produce great bodily injury. Because the use of force is not a necessary element of the crime of torture, assault by means of force likely to produce great bodily injury is not a lesser included offense of torture." (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1456.)

Turning to the accusatory pleadings test, we review the torture allegations in the information to determine whether they necessarily include all elements of assault with force likely to produce great bodily injury. The information's allegation followed the statutory definition of the crime. It stated defendant committed "a violation of Section 206 of the California Penal Code, Torture, in that [he] did willfully, unlawfully, and with the intent to cause cruel and extreme pain and suffering for the purpose of revenge, extortion, persuasion, and for any sadistic purpose, inflict great bodily injury" on Deanna.

This allegation does not allege that defendant committed torture by any means of force. As a result, assault by force likely to produce great bodily injury is not a lesser included offense of torture under the accusatory pleadings test. When the information

40

does no more than plead a charge in the language of the statute, the pleading test does not differ from the elements test.

Defendant, however, relies on *Ortega* to claim the existence of an "expanded accusatory pleading test" and to assert that aggravated assault is a lesser included offense of torture under that expanded test.

In *Ortega*, a panel of the Sixth Appellate District held that when a court applies the accusatory pleading test, it cannot determine whether an offense is a lesser included offense by examining only the accusatory pleading in isolation. Due process requires the court also to examine the facts derived from the defendant's preliminary hearing. "The evidence adduced at the preliminary hearing must be considered in applying the accusatory pleading test when the specific conduct supporting a holding order establishes that the charged offense necessarily encompasses a lesser offense." (*Ortega, supra*, 240 Cal.App.4th at p. 967.)

The California Supreme Court has held otherwise. "When applying the accusatory pleading test, '[t]he trial court need only examine the accusatory pleading.' ([*People v. Smith* (2013) 57 Cal.4th 232,] 244.)" (*People v. Banks* (2014) 59 Cal.4th 1113, 1160, overruled on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.) "Consistent with the primary function of the accusatory pleading test—to determine whether a defendant is entitled to instruction on a lesser uncharged offense—we consider *only* the pleading for the greater offense." (*People v. Montoya* (2004) 33 Cal.4th 1031, 1036, fn. omitted.) Indeed, the *Montoya* court overruled an appellate court's description of the accusatory pleading test because it was based on the pleadings and the facts in support of the conviction. (*Id.* at p. 1036, fn. 4, overruling *People v. Rush* (1993) 16 Cal.App.4th 20, 17-18.)

Relying on these higher authorities, the only published cases that have addressed *Ortega's* expansion of the accusatory pleading test have rejected it. (*People v. Alvarez* (2019) 32 Cal.App.5th 781, 787-790; *People v. Munoz* (2019) 31 Cal.App.5th 143, 157-

41

158; *People v. Macias* (2018) 26 Cal.App.5th 957, 963-965.) Additionally, other published authorities continue to follow the Supreme Court's rule against looking beyond the pleading when applying the accusatory pleading test. (See *People v. Bradley* (2021) 65 Cal.App.5th 1022, 1039; *People v. Chaney* (2005) 131 Cal.App.4th 253, 257, 258.)

We are bound by the decisions issued by the California Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Accordingly, we reject *Ortega* as inconsistent with Supreme Court precedent and do not apply its expanded accusatory pleading test here. Because aggravated assault is not a lesser included offense of torture under the statutory elements test or the accusatory pleading test, the trial court did not err by not instructing on aggravated assault.

C.     Instruction on lesser included offense of misdemeanor witness dissuasion

Defendant contends the trial court erred by not instructing sua sponte on misdemeanor witness dissuasion as a lesser included offense of felony witness dissuasion with force. Defendant also contends the court erred by not giving jurors a verdict form on which they could indicate whether the dissuasion was by force.

Contrary to defendant's assertion, the trial court instructed the jury on both types of witness dissuasion. Using CALCRIM Nos. 2622 and 2623, the court first instructed the jury on the elements of witness dissuasion as set forth in section 136.1, subdivisions (a) and (b), which do not include an element of force. It then instructed on the additional allegation that defendant used or threatened to use force under section 136.1, subdivision (c). The trial court emphasized that if the jury found defendant guilty of witness intimidation, it then had to decide whether he used or threatened to use force.

The use notes to CALCRIM No. 2622 direct the trial court, where felony witness dissuasion is alleged, to provide the jury with a verdict form on which the jury will indicate if the prosecution has proved the additional sentencing factor. The trial court

42

provided such a verdict form to the jury. It did not, however, provide the jury with a separate verdict form for misdemeanor witness dissuasion.

Any error, however, was harmless. "[A]ny failure to provide a form, if error it is, results in no prejudice when the jury has been properly instructed on the legal issue the trial presented. When 'the jury has been properly instructed as to the different degrees of the offense, it must be presumed that if [the jurors'] conclusion called for a form of verdict with which they were not furnished, they would either ask for it or write one for themselves. It certainly could have no necessary tendency to preclude them from finding such verdict. [¶] We discover no reversible error in the record . . . .' [Citations.]" (*People v. Osband* (1996) 13 Cal.4th 622, 689-690, quoting *People v. Hill* (1897) 116 Cal. 562, 570.)

Here, the jury was properly instructed on both types of witness dissuasion. The jury's finding that defendant dissuaded a witness by using or threatening to use force as prohibited under section 136.1, subdivision (c)(1) and its not asking for a different form implies no other form was needed. Had the jury wished to find defendant guilty of misdemeanor witness dissuasion, it would have either informed the court of the missing verdict form or written its own. Any error in not providing another form was harmless.

### D. Instruction on the intent element of torture

Defendant contends the trial court provided conflicting instructions to the jury on the intent element for the crime of torture. The trial court instructed the jury on torture using CALCRIM No. 810. This instruction stated the prosecution had to prove that when defendant inflicted great bodily injury on Deanna, he "intended to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." The instruction did not further explain this particular specific intent.

The trial court also gave the jury CALCRIM No. 252. This instruction defines general and specific intent and informs the jury which of the charged crimes and

allegations require a general criminal intent and which require a specific intent. When the trial court gave this instruction, it omitted the crime of torture in its list of crimes requiring a specific intent. CALCRIM No. 252 also informed the jury that an allegation of great bodily injury, which is an element of torture, required a general criminal intent.

Defendant claims the conflicting instructions violated his due process rights. He asserts the instructions told the jury that torture was both a specific intent crime and a general intent crime. Because the jury was also instructed that for general intent crimes, defendant merely had to commit acts with the wrongful intent, the jury could have found defendant guilty of torture based on finding only general criminal intent.

Defendant also contends that the intent element of torture in CALCRIM NO. 810, "to cause cruel or extreme pain and suffering," is vague and susceptible to a wide range of meanings. He claims the trial court erred by not clarifying that standard. He did not request a clarifying instruction.

Defendant did not object to either CALCRIM No. 810 or No. 252. Nonetheless, because the error, if one exists, could have affected defendant's due process rights, we review the arguments' merits. (§ 1259.) We assess de novo whether a jury instruction correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

"Because due process principles require the prosecution to prove every element of the crime beyond a reasonable doubt, jury 'instructions *completely removing* the issue of intent from the jury's consideration may constitute a denial of federal due process[.]' (*People v. Lee* (1987) 43 Cal.3d 666, 673.) Conflicting intent instructions—where one instruction requires the prosecution to prove intent while another instruction eliminates that requirement—can operate the same way. (*Id.* at pp. 673-674.) Accordingly, '[i]f conflicting instructions on the mental state element of an alleged offense can act to remove that element from the jury's consideration, the instructions constitute a denial of federal due process[.]' (*People v. Maurer* (1995) 32 Cal.App.4th 1121, 1126-1128[].) This is so even where the court's instructions on the offense itself correctly explain the

44

required intent, because we have 'no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict.' (*Francis v. Franklin* (1985) 471 U.S. 307, 322 []; see *People v. Gay* (2008) 42 Cal.4th 1195, 1225-1226.)" (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1164-1165.)

No due process violation occurred here. We disagree with defendant's description of the trial court's actions. The court did not instruct the jury that torture was both a specific intent crime and a general intent crime. Rather, in CALCRIM No. 810, it instructed the jury that torture was a specific intent crime. It merely omitted to name torture in CALCRIM No. 252 as a specific intent crime. Nothing in that omission removed the issue of defendant's specific intent from the jury's consideration. And nothing in CALCRIM No. 252 stating that intent to cause great bodily injury is a general criminal intent conflicted with CALCRIM No. 810's requirement that to find defendant guilty of torture, the jury had to find that defendant inflicted great bodily injury with the specific intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose. Thus, the only instruction the jury received about torture's intent element correctly informed the jury that the prosecution had to prove a specific intent. As a result, we know which instruction and definition of intent the jury applied—the correct one.

Moreover, clarifying instructions were not necessary to explain the meaning of the specific intent standard for torture. When a phrase " ' "is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request." ' [Citation.]" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1050-1051.) Even if the phrase is potentially ambiguous, the trial court does not have a duty to explain the phrase to the jury sua sponte. "If defendant believed the instruction was incomplete or misleading, he 'had the obligation to request clarifying language.' [Citation.]" (*Id.* at p. 1051.) Defendant did not request a clarifying instruction.

The phrase "intent to cause cruel or extreme pain and suffering" is not used in a technical sense peculiar to the law. Jurors will understand this standard of intent without needing further clarification from the court. If by chance they do not, they may ask the court for clarification—something the jury here did not do. Because the trial court correctly instructed on the element of intent without contradiction and with common language, defendant suffered no violation of his due process right to an instruction on the intent element of torture.

## III

### *Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct on three occasions: (1) the prosecutor elicited improper lay testimony from a police detective regarding Deanna's credibility regarding the rape charge; (2) the prosecutor argued in closing that Michelle said she witnessed defendant slap his sister when this fact was not admitted into evidence; and (3) the prosecutor argued in closing that the attack on Alvin proved that defendant had a predisposition for violence. Defendant claims these errors violated his federal right to due process and that the errors are prejudicial.

Defendant has forfeited these contentions. He did not object to any of the instances he claims were misconduct. "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

A defendant will be excused from the necessity of either a timely objection or a request for admonition if either would be futile. (*People v. Hill* (1998) 17 Cal.4th 800, 820.) Defendant, however, does not argue in his opening brief that an objection against any of the three alleged instances of misconduct would have been futile.

46

In his reply brief, defendant contends for the first time on appeal that his counsel rendered ineffective assistance by not making appropriate objections. This contention is also forfeited. We need not consider issues raised for the first time in the appellant's reply brief, including a claim of ineffective assistance of counsel. (See *People v. Carrasco* (2014) 59 Cal.4th 924, 990 [new theory of ineffective assistance raised for first time at oral argument and in subsequent supplemental reply brief is forfeited]; *People v. Bryant* (2013) 222 Cal.App.4th 1196, 1206, fn. 11 [ineffective assistance claim forfeited where not raised in opening brief and not adequately briefed in supplemental briefing on remand]; *United States v. Carter* (9th Cir. 2018) 754 Fed.Appx 534, 536 [ineffective assistance claim raised for first time in reply brief deemed waived].)

IV

*Sufficiency of the Evidence*

Defendant contends insufficient evidence supports his convictions of criminal threats, witness intimidation, torture, oral copulation, and rape.

In evaluating defendant's claims, " 'we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we

47

look for substantial evidence. [Citation.]" [Citation.] A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict. [Citation.]' [Citation.]" (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

## A.    Criminal threats

Defendant contends that insufficient evidence supports his conviction of criminal threats (count 13). To establish a criminal threat, "the prosecution must prove: (1) the defendant willfully threatened death or great bodily injury to another person; (2) the threat was made with the specific intent that it be taken as a threat, regardless of the defendant's intent to carry it out; (3) the threat was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution'; (4) the threat caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety'; and (5) this fear was reasonable under the circumstances. (§ 422, subd. (a); see *People v. Toledo* (2001) 26 Cal.4th 221, 227-228.)" (*People v. Turner* (2020) 10 Cal.5th 786, 826.)

Sufficient evidence supports the conviction. Defendant willfully threatened great bodily injury to Deanna's family. In a text to Deanna, he stated he had her sister's social security number, and he would hurt her family if she ever tried to leave.

Defendant argues that his statements were not unambiguous threats to kill or harm, but he refers only to his comments about having Deanna's sister's social security number and about sulfuric acid being able to burn a body. In his reply brief, he asserts the threat to hurt Deanna's family was too general to qualify as a threat that would result in great bodily injury.

Substantial evidence supports each element of the offense. Defendant's statement that he would hurt Deanna's family if she ever left is not ambiguous. To the extent the

statement was ambiguous, we may rely on the parties' history to provide context. The meaning of a defendant's threat must be gleaned from the words as well as the surrounding circumstances. (*In re Ryan D.* (2002) 100 Cal.App.4th 854, 860.) Viewing defendant's threat in light of his repeated physical attacks against Deanna, the jury could reasonably conclude he threatened to commit a crime against Deanna's family which would result in great bodily injury if Deanna left against his wishes.

Defendant threatened to hurt Deanna's family with the specific intent that Deanna would take the statement as a threat. Most threats " 'are designed to accomplish something; the threatener hopes that they *will* accomplish it, so that he won't have to carry out the threats.' " (*People v. Bolin* (1998) 18 Cal.4th 297, 339, quoting *United States v. Schneider* (7th Cir. 1990) 910 F.2d 1569, 1570.) The jury could conclude from the evidence that defendant threatened Deanna against leaving to prevent her from reporting the abuse. The threat worked, as Deanna did not report the abuse for a significant period of time.

Substantial evidence indicates the threat was "so unequivocal, unconditional, immediate, and specific" as to convey to Deanna a gravity of purpose and an immediate prospect of execution. (§ 422.) " 'The use of the word "so" indicates that unequivocality, unconditionality, immediacy and specificity are not absolutely mandated, but must be sufficiently present in the threat and surrounding circumstances to convey gravity of purpose and immediate prospect of execution to the victim.' " (*People v. Bolin, supra*, 18 Cal.4th at p. 340, quoting *People v. Stanfield* (1995) 32 Cal.App.4th 1152, 1157.)

Defendant's threat was clear. If she left him, he would hurt her family. The language used and the surrounding circumstances conveyed to Deanna a gravity of purpose and an immediate prospect of execution if she left. From years of abuse, Deanna knew that defendant's retribution for her perceived indiscretions was swift. The jury could conclude that his reaction to her leaving would be no different.

49

Substantial evidence also indicates that defendant's threat subjectively and objectively led Deanna to be in sustained fear. Deanna believed a person could track another person down with the other person's social security number. Although she had no idea how that would work, defendant's statement that he had her sister's social security number and would hurt her family "freaked [her] out." So much so, she told an interviewing detective that one of the reasons she stayed with defendant was because she was afraid of what defendant might do to her family.

The evidence also shows that Deanna's fear was objectively reasonable under the circumstances. Defendant repeatedly assaulted and battered Deanna, at times hitting her each time she said something he did not like. There was no reason to believe defendant would act differently toward Deanna's family members if Deanna left him.

Substantial evidence supports defendant's conviction of criminal threats.

B. Witness dissuasion

Defendant contends the evidence did not establish he attempted to dissuade Deanna from reporting any crimes to the police or that he did so by force.

A defendant is guilty of witness dissuasion or intimidation if the defendant attempts to prevent or dissuade another person who has been the victim of a crime from making a report of that victimization to law enforcement. (§ 136.1, subd. (b)(1); *People v. Cook* (2021) 59 Cal.App.5th 586, 590.)

"The circumstances in which the defendant's statement is made, not just the statement itself, must be considered to determine whether the statement constitutes an attempt to dissuade a witness from testifying [or a victim from reporting a crime]. (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1343.) If the defendant's actions or statements are ambiguous, but reasonably may be interpreted as intending to achieve the future consequence of dissuading the witness from testifying, the offense has been

50

committed.  (*People v. Ford* (1983) 145 Cal.App.3d 985, 989-990.)"  (*People v. Wahidi* (2013) 222 Cal.App.4th 802, 806.)

Substantial evidence indicates defendant attempted to dissuade Deanna not to report his abuse against her.  Deanna informed an interviewing detective that defendant told her not to do anything that would cause him to go to jail.  He also told her not to be a victim and not to get "caught up."

Defendant directed how Deanna should act around others to avoid suspicion.  On one occasion, he told Deanna not to get too "familiar" with friends at a party.  Deanna took the message to mean he was concerned she might talk to a friend about the abuse.  On another occasion, he told her to "be careful" that her mother would not see her bruising.

Defendant expressed to Deanna his concern that others, including family members, friends, coworkers, and doctors, might see her injuries from the abuse.  He wanted her to wear long-sleeved shirts so that others could not see her bruising.

The jury could reasonably conclude that defendant's directive to Deanna not to do anything that would cause him to go to jail and his directions for her to cover her injuries and be circumspect around others were attempts to dissuade Deanna not to report his abuse against her.

Defendant argues that even if sufficient evidence establishes his dissuasion, insufficient evidence establishes he dissuaded Deanna by force or threats of force. Knowingly and maliciously dissuading a victim from reporting a crime to law enforcement is a felony where "the act is accompanied by force or by an express or implied threat of force or violence . . . ."  (§ 136.1, subd. (c)(1).)  Defendant claims there is no evidence in the record showing that any of his dissuasive statements were "accompanied by" or had some temporal connection with an express or implied threat of force or violence.

51

The People argue that the threat of force was implicit in the context of the abusive relationship. Based on the relationship's history, Deanna knew that if she did something that displeased defendant, he would become physically violent. The People contend the jury could reasonably find that defendant attempted to dissuade Deanna by implied threats of force based on his history of abusing her.

Neither party directs us to published case law addressing whether or to what extent the history of a physically abusive relationship is sufficient to establish that an attempt by the defendant to dissuade the victim from reporting to the police was accompanied by an implied threat of force or violence, and we have found none. Nonetheless, the issue of whether the attempted dissuasion was accompanied by an implicit threat is a factual question for the jury to resolve, and the jury determined defendant attempted to dissuade Deanna by an implicit threat of force.

" 'There is, of course, no talismanic requirement that a defendant must say "Don't testify" or words tantamount thereto, in order to commit the charged offenses. As long as his words or actions support the inference that he . . . attempted by threat of force to induce a person to withhold testimony [citation] [or in our case, not report to authorities], a defendant is properly' convicted of a violation of section 136.1, subdivision (c)(1)." (*People v. Mendoza, supra*, 59 Cal.App.4th at p. 1344, quoting *People v. Thomas* (1978) 83 Cal.App.3d 511, 514.)

We conclude the jury on the record before us could reasonably find that defendant's attempts to dissuade Deanna from reporting the abuse were accompanied by an implied threat of force or violence. Deanna feared what defendant would do if she reported the abuse. On February 18, 2017, when Deanna returned to her apartment after having been severely beaten by defendant the day before and on February 14th, she planned to move out of state that day where it would be harder for defendant to reach her. She told her roommate, Jennifer Pham, of her plan.

52

Deanna showed Pham some of her injuries. Pham told Deanna she would take her to the hospital. Deanna did not want to go the hospital because police would get involved. She was afraid that defendant would find out and it would make him "a lot more upset." After Pham explained that her life was more important than anyone else's, Deanna agreed to go to the hospital.

At the emergency room, Deanna began receiving text messages from defendant. She asked Pham to respond to him as if she were Deanna. Deanna felt that if she did not respond, defendant would be concerned about her whereabouts. She wanted to make sure that it was not obvious where she was. She was worried about her and her family's safety and the safety of their belongings. Defendant knew where Deanna's mother lived and what kind of car she drove. Pham responded for Deanna to a few of defendant's texts, and then left the hospital when Deanna's mother arrived.

When Deanna met with Officer Gee at the hospital, she expressed concern about what might happen if defendant did not see her that evening. Based on her concern, law enforcement determined that defendant was an imminent threat to Pham's life, and he needed to be found quickly. Officer Gee pinged defendant's phone. Defendant was located at Vanessa's home, where he was arrested.

From this evidence, viewed in the context of the relationship's abusive history, the jury could reasonably conclude that defendant had implicitly threatened Deanna not to report the abuse to police. Because of that threat, Deanna feared what defendant might do to her or her family and friends if he learned she had reported the abuse. Substantial evidence thus supports the jury's determination that defendant attempted to dissuade Deanna from reporting the abuse by means of an implicit threat of force or violence.

C.    Torture

Defendant contends the evidence does not support his conviction of torture. A person who inflicts great bodily injury upon another person is guilty of torture if the

53

person inflicted the injury "with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose . . . ." (§ 206.) Defendant claims the evidence does not establish that he intended to inflict cruel or extreme pain or suffering on Deanna on February 14-17, 2017.

Defendant specifically argues that he cannot be convicted of torture because his conduct was not the type of conduct that constitutes torture. Defendant asserts that in order for the crime of torture to be distinguished from the crime of aggravated assault with great bodily injury, a finding that he intended to cause cruel or extreme pain or suffering must be based on conduct that was "extremely violent and callous."

Defendant's argument mirrors the dissent in *People v. Pre* (2004) 117 Cal.App.4th 413 (*Pre*). That dissent states, "Notwithstanding the original intent underlying the adoption of Penal Code section 206 [by the voters in approving Proposition 115 in 1990], the application of the statute has expanded, by judicial accretion, to any assault in which the victim suffers 'great bodily injury' where the jury infers an intent to inflict cruel and extreme pain, regardless of whether the assailant's conduct was extremely violent and callous. (See, e.g., *People v. Hale* (1999) 75 Cal.App.4th 94, 108 [holding that the crime of torture focuses on the mental state of the perpetrator, not on whether actual pain was inflicted].) Under such an application of the statute, virtually any aggravated assault proscribed by Penal Code section 245 that results in great bodily injury may qualify as torture under Penal Code section 206; if the jury infers the requisite intent from the defendant's conduct, the defendant will be subject to a life sentence rather than a two- to four-year sentence applicable to an aggravated assault conviction ([] § 245, subd. (a)), even if the crime was not particularly heinous and the injuries were not particularly substantial. This is not what the voters intended in passing Proposition 115." (*Pre, supra*, 117 Cal.App.4th at p. 426 (conc. & dis. opn. of McIntyre, J.).)

The *Pre* majority, however, rejected the dissent, and thus defendant's interpretation of section 206. The dissent's "characterization disregards the fact that for a

torture conviction the jury must not only find the defendant inflicted great bodily injury but also that the defendant intended to do so for the purpose of revenge, extortion, persuasion, or some other sadistic purpose. This additional intent requirement distinguishes the offense of torture from an aggravated assault and is clearly a matter for a jury to determine." (*Pre, supra*, 117 Cal.App.4th at p. 423.)

Moreover, the California Supreme Court "has made it clear that the purpose of additional punishment for conduct amounting to torture is not based on the victim experiencing extreme pain or suffering or the presence of extreme violence, since extreme violence may exist in circumstances involving other conduct such as an explosion of violence. (*People v. Mincey* [(1992)] 2 Cal.4th 408, 432.) Rather, the Supreme Court has explained the additional punishment is imposed because the defendant's *intent* to inflict pain for a sadistic purpose is deserving of additional punishment. (*People v. Davenport* [(1985)] 41 Cal.3d 247, 267-268; *People v. Wiley* (1976) 18 Cal.3d 162, 168-169.) The focus must be on the defendant's intent to inflict pain for revenge, extortion, persuasion or for any sadistic purpose rather than on the severity of the injuries or the duration of the attack." (*Pre, supra*, 117 Cal.App.4th at p. 424.)

The California Supreme Court rejected defendant's argument again in *Jennings, supra*, 50 Cal.4th 616 with regards to a torture-murder special circumstance. To prove a torture-murder special circumstance allegation, the prosecution must establish that the defendant intended to kill and intended " 'to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose.' [Citation.]" (*People v. Brooks* (2017) 3 Cal.5th 1, 65.) In *Jennings*, the defendant contended that starvation could not constitute torture as a matter of law because it involved the passive withholding of nourishment instead of a particular type of violent conduct. (*Id*. at p. 683.) The Supreme Court disagreed. It approved the holding of *People v. Lewis* (2004) 120 Cal.App.4th 882, which concluded, " 'The statutory definition of torture does

not require a direct use of touching, physical force, or violence, but instead is satisfied if the defendant, directly or indirectly, inflicts great bodily injury on the victim. Thus a defendant may commit torture without necessarily committing a battery.' (*Id.* at p. 888, italics added.)" (*Jennings, supra*, 50 Cal.4th at p. 684.)

Contrary to defendant's argument, these authorities establish that the prosecution is not required to show that defendant's actions were extremely violent and callous as part of proving defendant's intent to cause cruel or extreme pain and suffering. Thus, the issue before us is whether substantial evidence supports the jury's finding that defendant (1) caused great bodily injury to Deanna with the intent to cause cruel or extreme pain and suffering, and (2) did so for the purpose of revenge, extortion, persuasion, or for any sadistic purpose. (§ 206.) We have no trouble finding that it does.

The requirement of an intent to inflict "cruel" pain and suffering refers to the defendant having an intent to inflict extreme or severe pain. (*People v. Aguilar* (1997) 58 Cal.App.4th 1196, 1202.) " 'Absent direct evidence of such intent, the circumstances of the offense can establish the intent to inflict extreme or severe pain.' [Citation.] For example, 'a jury may infer intent to cause extreme pain from a defendant who focuses his attack on a particularly vulnerable area, such as the face, rather than indiscriminately attacking the victim.' [Citation.]" (*People v. Hamlin, supra*, 170 Cal.App.4th at pp. 1426-1427.) A jury could also reasonably determine that a defendant "who deliberately strikes his victim on an area of the body that is already injured has the intent to cause severe pain[.]" (*Id.* at p. 1430.) And although the severity of the victim's wounds is not necessarily determinative of the defendant's intent to torture, the condition of the victim's body may establish circumstantial evidence of intent. (*Pre, supra*, 117 Cal.App.4th at p. 421.)

Sufficient evidence establishes that over February 14-17, 2017, defendant inflicted great bodily injury on Deanna with the intent to inflict extreme or severe pain for revenge and for defendant's sadistic pleasure. On Valentine's Day evening at defendant's

workplace, defendant repeatedly asked Deanna questions about her activities the prior Valentine's Day with Charley and slapped and hit her when she answered. Deanna fell and got back up, but he knocked her down by punching her in the leg, kneeing her in the stomach, and hitting her in the chest. When she did not get back up, defendant kicked her in her ribs and stomped on her chest. She used her legs to cover her chest, but he kicked them so she could not move them anymore. The attack lasted for over an hour. Defendant refused to stop when Deanna asked.

The attacks continued on February 17, 2107. After having oral copulation and sexual intercourse, defendant saw a name in Deanna's phone that matched the name of someone with whom he knew she had been intimate. That started a "repeat of Valentine's Day," a chain-reaction of defendant questioning Deanna about her relationship with this person and stomping and kicking her in the same areas of her body he had attacked on Valentine's Day.

Deanna suffered bruising, abrasions, and redness over most of her body; a gash on her right forearm; burn scars, and a scar on her right eyebrow. She also had six fractured ribs and a bruised left kidney. Deanna's rib fractures were less than a week old.

Based on this evidence, the jury could reasonably determine that defendant caused great bodily injury to Deanna with the intent to inflict extreme or severe pain. Much of defendant's attacks focused on Deanna's chest and ribs. The jury could reasonably infer that defendant's repeatedly striking Deanna on an area of her body he had already injured three days earlier demonstrated his intent to cause severe pain. (*People v. Hamlin, supra*, 170 Cal.App.4th at pp. 1426-1427.) Deanna's six ribs fractured during that time frame is also probative of defendant's intent. (*Pre, supra*, 117 Cal.App.4th at p. 421.)

In addition to the evidence of defendant's intent to cause severe pain, the record contains evidence that defendant intended to cause Deanna severe pain for revenge and for sadistic purposes. As already recounted, defendant regularly questioned Deanna about her prior relationships and assaulted her based on her answers, especially when she

57

revealed having other relationships when she had told defendant she would be loyal to him. The attacks on February 14-17, 2017, arose from that scenario. On the 14th, defendant told her she deserved the abuse because of her prior relationship with another man.

As already noted above, the evidence of defendant's attack on Alvin also demonstrated defendant's specific intent to cause Deanna severe pain out of revenge. His attack on Alvin, like his attacks on Deanna, was to exact revenge for what defendant believed was Alvin's betrayal of their friendship by having relations with Michelle. This evidence of common motive tended to prove defendant attacked Alvin and Deanna with the specific intent to cause cruel or extreme pain and suffering for the purpose of revenge. The jury could reasonably conclude from the evidence that defendant acted out of revenge.

The jury could also reasonably conclude that defendant attacked Deanna for sadistic purposes. "[S]adistic purpose" encompasses the phrase's common meaning, i.e., " 'the infliction of pain on another person for the purpose of experiencing pleasure.' " (*People v. Aguilar, supra*, 58 Cal.App.4th. at p. 1203.) Defendant told Deanna that he enjoyed hurting her. He would look at the injuries on her body and act like he was proud of what he had done.

Based on the evidence, the jury could reasonably find that defendant committed the offense of torture against Deanna.

### D. Oral copulation

Defendant claims the evidence does not support his conviction of committing forcible oral copulation on February 17, 2017. He argues that he and Deanna texted each other before their meeting about her orally copulating him. No evidence shows she withdrew her consent, even during the act when he repeatedly hit her for scraping him and for not performing the act as he desired.

It is a felony for any person to commit an act of oral copulation when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person. (§ 287, subd. (b)(2)(A).) Accomplishing a sex crime "against the victim's will" is synonymous with "without the victim's consent." (*People v. Oliver* (2020) 54 Cal.App.5th 1084, 1094-1095.)

Consent is a defense. (§ 261.6.) "Consent" of the victim is statutorily defined as "positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved." (§ 261.6.) This definition "describes consent that is actually and freely given without any misapprehension of material fact." (*People v. Giardino* (2000) 82 Cal.App.4th 454, 459-460 (*Giardino*).) A current or previous dating or marital relationship is not sufficient to constitute consent where consent is at issue in a prosecution for forcible oral copulation. (§ 261.6.)

Evidence of force or fear "is directly linked to the overbearing of a victim's will[.]" (*People v. Maury* (2003) 30 Cal.4th 342, 403.) By referring to sex acts accomplished against the victim's will, statutory prohibitions of those acts when accomplished by force, violence, duress, menace, or fear of immediate and unlawful bodily injury describe instances in which the victim has not actually consented. (*Giardino, supra*, 82 Cal.App.4th at p. 460 (rape).)

For purposes of defining forcible oral copulation, "duress" means " 'a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilies to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' ([*People v.*] *Pitmon* [(1985)] 170 Cal.App.3d [38,] 50 [disapproved on another ground in *People v. Soto* (2011) 51 Cal.4th 229, 248, fn. 12].)" (*People v. Leal* (2004) 33 Cal.4th 999, 1004.)

Submission does not constitute consent. "For instance, a victim's decision to submit to an attacker's sexual demands out of fear of bodily injury is not consent [citations] because the decision is not freely and voluntarily made (§ 261.6). A selection by the victim of the lesser of two evils—rape versus the violence threatened by the attacker if the victim resists—is hardly an exercise of free will." (*Giardino, supra*, 82 Cal.App.4th at p. 460, fn. 3.)

Sufficient evidence shows that Deanna submitted to performing oral copulation on defendant under duress. On February 17, 2017, defendant texted Deanna to hurry because he wanted "my blowie," referring to oral sex. She replied, "I'm not even off work yet." Defendant wrote back, "so what? I want I'm just telling you to hurry lol."

After finishing her work, Deanna went to defendant's workplace and orally copulated him. Deanna testified she agreed to do it because it was "the easier thing to do" than to have to argue with him. She was concerned that if she argued with him over it, something might happen. He would go into detail on the questions he typically asked her.

During the oral copulation, Deanna's teeth kept scraping defendant's penis. Her mouth was so sore from the Valentine's Day beating, she could barely open it. Each time this happened, defendant slapped her in the face. He said she could do it better and demeaned her for being with other men. Even when she performed better, he slapped her in the face.

The jury could reasonably find that Deanna did not willingly consent to orally copulate defendant. She submitted to it under duress; it was "the easier thing to do" than to have to argue with him. She feared something would happen if she did not perform the act. He might begin the cycle of questioning again. In the past, those questions inevitably led to violence. She also continued to perform the act under force and duress despite pain from her mouth because defendant kept slapping her face whether or not she hurt him. The jury could reasonably infer that given the pain she was experiencing, she

60

would not have willingly consented otherwise. Substantial evidence thus supports defendant's conviction of forcible oral copulation.

E.    Rape

Defendant contends insufficient evidence supports his conviction of forcibly raping Deanna on February 17, 2017. He asserts that no substantial evidence indicates Deanna did not consent to intercourse or that she withdrew consent during the sex act. Based on their sexual history, defendant reasonably believed she consented to the act.

Forcible rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator and against that person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another. (§ 261, subd. (a)(2).) "In the context of rape, 'against the victim's will' is synonymous with 'without the victim's consent.' [Citation.]" (*Giardino, supra*, 82 Cal.App.4th at p. 460.)

The defense of consent discussed in the previous section applies equally to the crime of forcible rape. For purposes of rape, "consent" is defined the same as it is for forcible oral copulation. It is the "positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved." (§ 261.6.) As with oral copulation, a current or previous dating or marital relationship is not sufficient to constitute consent where consent is at issue in a rape prosecution. (§ 261.6.) In addition, a victim's lack of physical resistance may not be employed by courts to support a finding of insufficient evidence of rape. (*People v. Barnes* (1986) 42 Cal.3d 284, 303.)

The jury could reasonably find on the evidence in the record that Deanna submitted to but did not consent to sexual intercourse with defendant on February 17, 2017, out of duress and fear of injury. After forcing Deanna to orally copulate him at his workplace that day, defendant told Deanna he wanted to have sex with her. Deanna said

61

she was worried about not being able to have sex because she was "so messed up," she could not think of a way she could possibly be comfortable. She was sore and had so many bruises, she worried that having sex would hurt her. Defendant told her she would just lay on her back. He gave her a sweater to put underneath her, and they had sex. She told him her body hurt and she "wasn't down" for it. Defendant did not care, and he kept having sex with her. Deanna testified she was "so willing to follow through." She just wanted to be comfortable to make it easier on herself.

Afterward, as mentioned earlier, while viewing texts on Deanna's cell phone, defendant saw a name in her phone that matched the name of someone with whom he knew she had been intimate. That started a "repeat" of the Valentine's Day attack.

The jury could reasonably conclude that Deanna submitted to defendant's duress and did not consent to sexual intercourse. "Duress" for purposes of defining forcible rape means "a direct or implied threat of force, violence, danger, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed, or acquiesce in an act to which one otherwise would not have submitted. The total circumstances, including the age of the victim, and the victim's relationship to the defendant, are factors to consider in appraising the existence of duress." (§ 261, subd. (b).)

Deanna expressly denied consent. Before the act began, she told defendant she was worried about not being able to have sex because she was "so messed up," and she could not think of a way she could possibly be comfortable. Defendant told her in effect to lay down. Deanna also told defendant she was not "down" for intercourse. Deanna testified, however, that defendant did not care. He continued to have sex with her anyway.

Deanna had just performed oral sex on defendant while being repeatedly hit in order to avoid an argument with him. She reasonably could have submitted to intercourse for the same reason, despite later saying she was willing to follow through

62

with it. Given defendant's history of abusing Deanna during arguments and the abuse she had already suffered that day, the jury could reasonably conclude that Deanna submitted to defendant's demand for intercourse due to his duress—an implicit threat of continued abuse or of another attack if she refused his demand.

Defendant contends the evidence shows he believed in good faith that Deanna had consented. A defendant's mistaken but reasonable and bona fide belief that the victim voluntarily consented is a defense. (*People v. Mayberry* (1975) 15 Cal.3d 143, 155.) This defense has subjective and objective components. The subjective component asks whether the defendant honestly and in good faith believed that the victim consented to sexual intercourse. The objective component asks whether the defendant's mistake as to consent was reasonable under the circumstances. (*People v. Williams* (1992) 4 Cal.4th 354, 360-361.)

The jury could reasonably find that the evidence did not establish either component. The defendant could not in good faith have believed Deanna consented to intercourse when she told him she was not "down" for it, that her body hurt, and that sex might hurt her. And any mistake as to her consent was not reasonable under the circumstances. Defendant knew how Deanna felt and saw her injuries from his beating her three days earlier. He had earlier slapped in the face her numerous times and knew she was in so much pain she could not get comfortable and could barely open her mouth. The jury could find that in that condition, Deanna would not consent unless subject to some type of force or duress.

Defendant relies on the fact that Deanna told police a number of times that she was not raped. She also testified at the preliminary hearing that she wanted to make clear she had not been raped. But Deanna also testified that defendant needed to pay for what he did, and that her trial testimony about the events that happened was the truth. The jury was tasked with determining the facts, and in light of all of Deanna's testimony and the

63

circumstances of her relationship with defendant, it could have reasonably determined not to credit Deanna's statements that she was not raped.

Viewing the evidence in the light most favorable to the prosecution, we conclude substantial evidence supports defendant's conviction of forcible rape.

V

*Denial of Request for Private Counsel*

Defendant contends the trial court abused its discretion when, at sentencing, the court denied his request for a continuance to retain private counsel.

A.     Background

Defendant sought to remove his appointed counsel twice before trial. On June 27, 2017, the trial court held a *Marsden* hearing on defendant's first request to obtain a new court-appointed attorney. The trial court denied the motion. Defendant requested a second *Marsden* hearing on July 26, 2017, during a trial setting conference. He claimed in open court that there was a conflict between he and counsel, and that counsel was not adequately prepared. He also indicated there was bias. Following a hearing, the trial court denied the motion.

The jury returned its verdicts on November 15, 2017. The following day, November 16, and with defendant present, defense counsel sought to waive the statutory time for sentencing because she needed to gather information related to defendant's possible eligibility for youth offender parole. The prosecution opposed, but the trial court granted the waiver. It set sentencing for January 12, 2018.

Defendant filed a motion for new trial on January 3, 2018. He sought a new trial on the ground that insufficient evidence supported his convictions of torture, rape, and criminal threats. The motion was set to be heard at sentencing.

By the time of sentencing on January 12, 2018, the trial court and the attorneys had received an undated letter from defendant requesting another continuance of

64

sentencing so he could hire a private attorney. In the letter, defendant stated he had no communication with counsel, and he disagreed with her about the issues to be raised in his new trial motion. He stated his family was in the process of obtaining assistance of private counsel to "perfect the points of [his] motion for re-trial."

At sentencing, defense counsel informed the court that defendant's foster-mother was trying to obtain new counsel for the new trial motion. She had not decided which attorney she was going to hire, but she was putting together a retainer for that. Defendant's letter was the first time counsel had heard of defendant's intention.

The prosecutor objected to a continuance. The People were prepared to proceed with sentencing that day. The court was prepared to hear the new trial motion. The victim, the victim's mother, and Michelle's parents were present to address the court. The case had been continued in November and notice of this request was late. There was no guarantee that an attorney had been retained.

The trial court denied the continuance. It ruled in full: "There's no grounds for continuance and desire to hire a new attorney. There's no grounds to do so." The court also denied the motion for new trial.

### B.     Analysis

"The Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense.' " (*United States v. Gonzalez–Lopez* (2006) 548 U.S. 140, 144 (*Gonzalez-Lopez*).) "The right to the effective assistance of counsel 'encompasses the right to retain counsel of one's own choosing.' " (*People v Courts* (1985) 37 Cal.3d 784, 789 (*Courts*); *Gonzalez–Lopez, supra*, at p. 144 [recognizing that "an element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him"].) " 'A necessary corollary [of the right] is that a defendant must be given a reasonable opportunity to

65

employ and consult with counsel; otherwise, the right to be heard by counsel would be of little worth. [Citations.]' " (*Courts, supra*, at p. 790.)

However, the right of a defendant to appear and defend with retained counsel of his own choice is not absolute. (*People v. Blake* (1980) 105 Cal.App.3d 619, 623.) "[A] defendant who desires to retain his own counsel is required to act with diligence and may not demand a continuance if he is unjustifiably dilatory or if he arbitrarily desires to substitute counsel at the time of the trial." (*Id.* at pp. 623-624.) The defendant's right " 'must be carefully weighed against other values of substantial importance, such as that seeking to ensure orderly and expeditious judicial administration, with a view toward an accommodation reasonable under the facts of the particular case.' [Citation.]" (*Id.* at p. 624.)

We review a trial court's decision to deny a request for a continuance in order to seek private counsel for abuse of discretion. (*People v. Pigage* (2003) 112 Cal.App.4th 1359, 1367; *People v. Blake, supra*, 105 Cal.App.3d at p. 624 ["it is within the sound discretion of the trial court to determine whether a defendant shall be granted a continuance to obtain a private counsel"].) "[T]here is no mechanical test for deciding whether a denial of a continuance is so arbitrary as to violate due process but rather each case must be decided on its own facts." (*People v. Blake*, at p. 624.) Defendant bears the burden of showing an abuse of discretion; in the absence of such a showing, we will not disturb the trial court's ruling on appeal. (*People v. Pigage*, at p. 1367.) If an abuse of discretion amounts to a denial of the defendant's right to counsel of choice, the error is deemed "structural" and not subject to harmless-error analysis. (*Gonzalez–Lopez, supra*, 548 U.S. at pp. 150, 152.)

We conclude the trial court did not abuse its discretion in denying the continuance. The trial court could reasonably determine that defendant had been unjustifiably dilatory in bringing the request and seeking to retain private counsel. There is no showing that defendant was diligent in seeking to retain counsel. He began contesting his appointed

counsel's performance twice before trial commenced, yet he took no steps to retain private counsel until days before sentencing.

After the verdicts were rendered, defendant waited until the eve of sentencing, which had already been continued once at his request for an unrelated purpose, to announce his desire to retain private counsel. There was no evidence explaining why defendant waited so long. Nor did he provide evidence that he could afford private counsel. Apparently, at the time he could not. His family was "in the process" of obtaining sufficient funds, but there was no indication how much time that would take, nor was there any indication of who defendant might actually hire.

In addition, defendant offered insufficient grounds to retaining private counsel. He asserted there was a disagreement with counsel over the grounds to be raised in a new trial motion, but apparently counsel was not aware of the disagreement because she filed a new trial motion and knew nothing of defendant's concern until she received a copy of his letter before the sentencing hearing. Moreover, defendant contends in his opening brief that he wanted to raise the issue of ineffective assistance. His letter did not mention that ground, and he has not raised that issue on appeal. In effect, that argument is forfeited.

Defendant criticizes the trial court for not making express findings, but we are required on appeal to imply all findings necessary to uphold the court's judgment which the evidence may support. Sufficient evidence supports the court's implied findings. With no evidence explaining the delay for seeking retained counsel or showing diligent effort to obtain counsel, the trial court was within its discretion to deny the request for a continuance to ensure the orderly and expeditious administration of its judicial duties.

VI

*Alleged Sentencing Errors*

Defendant claims the trial court committed error in sentencing by (1) not staying the sentences for three counts of corporal injury and for rape and oral copulation under section 654 and (2) granting a post-trial protective order in favor of Vanessa. Defendant also contends that (3) we should remand to allow the court to exercise its discretion under Senate Bill No. 1393 to strike his serious felony prior; (4) excluding him from youth offender parole violates his equal protection rights; and (5) we should remand to allow the court to exercise its discretion under Senate Bill No. 567 and Assembly Bill No. 124 to reduce the upper term sentences on counts 2, 21, and 22 to the middle or lower terms.

A.     Section 654

Defendant contends the trial court erred by not staying the sentences for the following counts under section 654: count 3 for corporal injury because the prosecutor relied on this battery to prove the forcible sodomy charge in count 2; and counts 18 and 20 for corporal injury, count 21 for forcible rape, and count 22 for forcible oral copulation because they were part of the torture charge in count 1.

1.     Legal background

Section 654 prohibits multiple punishments for the same act. It provides: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).)

"Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective. (See *Neal* [*v. State* (1960)] 55 Cal.2d [11,] 19;

68

*People v. Beamon* (1973) 8 Cal.3d 625, 639.)  We first consider if the different crimes were completed by a 'single physical act.'  ([*People v.*] *Jones* [(2012)] 54 Cal.4th [350,] 358.)  If so, the defendant may not be punished more than once for that act.  Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single ' "intent and objective" ' or multiple intents and objectives.  (*Id.* at p. 359; see also *People v. Mesa* (2012) 54 Cal.4th 191, 199 [] ['Our case law has found multiple criminal objectives to be a predicate for multiple punishment only in circumstances that involve, or arguably involve, multiple acts'].)"  (*People v. Corpening* (2016) 2 Cal.5th 307, 311-312.)

" 'The proscription against double punishment in section 654 is applicable where there is a course of conduct which . . . comprises an indivisible transaction punishable under more than one statute . . . .  The divisibility of a course of conduct depends upon the intent and objective of the actor . . . .' [Citation.]  'The defendant's intent and objective are factual questions for the trial court; [to permit multiple punishments,] there must be evidence to support a finding the defendant formed a separate intent and objective for each offense for which he was sentenced.  [Citation.]'  (*People v. Adams* (1982) 137 Cal.App.3d 346, 355.)"  (*People v. Coleman* (1989) 48 Cal.3d 112, 162.)

Where the trial court does not stay a sentence pursuant to section 654 and offers no factual basis for its decision, we presume the court found that the defendant harbored a separate intent and objective for each offense. (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1147.)  We must uphold the trial court's determination that defendant's crimes for purposes of section 654 were separate and involved separate intents and objectives if substantial evidence supports the determination.  (*People v. Kelly* (2018) 28 Cal.App.5th 886, 903.)

2. Analysis

a. Count 3

Counts 2 and 3 arose from defendant's physical and sexual abuse of Deanna on January 10, 2017, while defendant was house-sitting for a friend. Defendant followed Deanna into the bathroom, asking her if she was being honest with him and to tell him everything she had done with Charley. She tried answering his questions, but defendant slapped her in the face when she answered.

Defendant refused to allow Deanna to use the toilet. She urinated on herself. Defendant made her clean up her urine with her clothes and her hair. She removed her wet clothes and laid on the floor in her urine. Defendant made her lick the urine off the floor.

Defendant kept asking Deanna questions about what she had done sexually with Charley, and specifically whether they had engaged in anal sex. She said they had not. Defendant kept interrogating her, slapping her in the face, and hitting her "everywhere." She stood up, but he slapped her face, chest, arms, and legs until she was too scared to stand. She laid back down with her belly on the floor. Defendant had anal intercourse with her there. While he did, he hit her once on her head. Her head hit the floor, splitting her eyebrow. Deanna told him she did not want to "do this," but he said he did not care. In addition to the cut eyebrow, Deanna had bruises on her arms and chest from the attack.

The jury found defendant guilty on count 2 of forcible sodomy and on count 3 of willful corporal injury with a prior. (§§ 286, subd. (c)(2); 273.5, subds. (a), (f).) The trial court sentenced defendant to 16 years on count 2 and 2 years, 8 months on count 3. Defendant claims the prosecutor relied on the same incident and conduct for both counts. He argues the cut eyebrow was both the force to commit sodomy and the corporal injury. The punches and kicks also supplied evidence of menace necessary to prove forcible sodomy.

70

The prosecutor relied on the injury Deanna sustained to her eyebrow during the sodomy as the corporal injury charged in count 3. The prosecutor did not, however, rely on the cut eyebrow as evidence of the force defendant used to commit sodomy. For that force, the prosecutor relied on defendant's actions that led up to the sodomy: making Deanna urinate on herself, making her clean it up with her clothes and hair, making her lick the urine, interrogating her about whether she and Charley had anal sex, and slapping and hitting her so much she was too scared to stand and finally just lay on the floor naked. It was that force, retribution, duress, menace, and fear that allowed defendant to commit sodomy.

From this evidence, the trial court could reasonably find that defendant harbored separate objectives in committing the two offenses. Defendant had sodomy forcibly with Deanna for revenge based on his belief that she had anal intercourse with Charley but not with him. Having overcome any resistance to sodomy, defendant while committing the act hit Deanna in the head and split her eyebrow for a reason other than wanting to engage in sodomy for the sake of revenge. He simply wanted to hurt her physically, like he had done many times before without seeking sex.

Defendant's reliance on *People v Liakos* (1982) 133 Cal.App.3d 721, is misplaced. In that case, the defendant physically assaulted the victim in order to attempt to commit rape and oral copulation. The court of appeal held that as a result, the defendant could not be punished for assault with intent to commit rape and oral copulation and attempted rape and oral copulation. (*Id.* at p. 725.)

Here, the trial court could reasonably conclude that defendant did not commit corporal injury in order to commit sodomy. He had already committed sodomy by force and continued to do so without any resistance when he hit Deanna in the head. Substantial evidence supports the court's determination not to stay sentencing on count 3 under section 654.

71

b.        Counts 18, 20, 21, and 22

These counts arose from defendant's physical abuse, oral copulation, and rape of Deanna over February 14 and 17, 2017, the same time period in which defendant committed torture. The jury found defendant guilty on counts 18 and 20 of willful corporal injury causing great bodily injury and with a prior, with count 18 occurring on February 14, 2017, and count 20 occurring on February 17, 2017. (§ 273.5, subds. (a), (f)(1).) The jury found defendant guilty on count 21 of forcible rape and count 22 of forcible oral copulation. (§§ 261, subd. (a)(2); former 288a, subd. (c)(2), now 287, subds. (a), (c)(2)(A).)

Defendant contends these counts were part of the course of conduct used to prove torture. Along with the People, we agree that counts 18 and 20 were part of the same conduct. In closing argument, the prosecutor stated that the acts of corporal injury were part of the course of conduct that made up the torture charge. We will order execution of the sentences on these counts be stayed.

However, the trial court could reasonably conclude that the rape and oral copulation were not committed with the same intent and objective as the torture. To commit torture, the defendant must intend to cause extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose. (§ 206.) Defendant committed the oral copulation and rape on February 17 without the intent to cause extreme pain and suffering. Earlier that day, he texted Deanna to hurry from work because he wanted her to orally copulate him. When she arrived, she performed the act because she feared what would happen if she did not. Defendant accomplished the offense by this duress. He also accomplished it by force because he regularly slapped Deanna in the face during the act. At first, he hit her because her teeth scraped him. But he continued hitting her to demean her and because of her prior relationships with others.

72

The trial court could reasonably conclude that defendant slapped Deanna during the act for reasons other than causing extreme pain and suffering.

After the oral copulation, defendant compelled Deanna to have sexual intercourse with him against her consent. He did not commit any acts of violence to overcome her will or to cause extreme pain or suffering. Rather, he coerced her through the duress he had created in their relationship. The acts of torture that began on February 14 resumed *after* the oral copulation and rape had occurred and after defendant saw images of another man in Deanna's cell phone. At that point, defendant began hitting and kicking Deanna in the same locations on her body he had attacked on February 14. The trial court could reasonably conclude from this evidence that defendant forcibly raped and orally copulated with Deanna with a different intent and objective than when he tortured her.

Defendant's reliance on *People v. Mejia* (2017) 9 Cal.App.5th 1036 does not further his argument. In that case, defendant was convicted of torture, spousal rape, corporal injury, and criminal threats. The trial court sentenced the defendant on each crime. The court of appeal held that section 654 required a stay of the sentences for the rape and corporal injury because both offenses "were included among the acts underlying the torture count and were essential to satisfying an element of that offense." (*Id.* at p. 1046.)

Here, the acts of rape and oral copulation on February 17, 2017, were not essential to establishing the torture offense. Defendant's repeated acts of kicking and stomping Deanna on the same locations on her body over the course of two days to cause extreme pain for revenge and his sadistic gratification were sufficient to establish the elements of torture. The court could reasonably find that the torture began on February 14, 2017, and resumed after defendant had committed rape and oral copulation.

Substantial evidence thus supports the trial court's determination not to stay the sentences on counts 21 and 22 under section 654.

B.    <u>Post-trial</u> <u>restraining</u> <u>order</u> <u>for</u> <u>Vanessa</u>

At sentencing, the trial court ordered a 10-year protective order for Vanessa's benefit under section 136.1. Defendant contends the order was unauthorized, as no statute authorizes a protective order for a witness after trial has concluded.

Section 136.1, the statute under which the trial court stated it was acting, does not authorize criminal protective orders for witnesses. That statute defines the offense of witness intimidation and its penalties.

Protective orders issued in criminal proceedings "must comply with the requirements of section 136.2, unless a more specific statute applies. (*People v. Selga* (2008) 162 Cal.App.4th 113, 118.) [Although the trial court cited section 136.1 at the sentencing hearing, the actual order stated it was authorized under section 136.2, subdivision (i)(1).] Section 136.2 authorizes protective orders which 'are "operative only during the pendency of criminal proceedings and as prejudgment orders." ' (*People v. Scott* (2012) 203 Cal.App.4th 1303, 1325; see *People v. Beckemeyer* (2015) 238 Cal.App.4th 461, 465.) The only purpose of a section 136.2 protective order is to ' "protect victims and witnesses in connection with the criminal proceeding in which the restraining order is issued in order to allow participation without fear of reprisal." ' (*People v. Ponce* (2009) 173 Cal.App.4th 378, 383 [].)" (*People v. Corrales* (2020) 46 Cal.App.5th 283, 285-286.)

An exception to the general rule of criminal protective orders operating only during trial is found in subdivision (i) of section 136.2. Under that provision, when a defendant has been convicted of a crime involving domestic violence, rape, or other crimes not relevant here, the court at the time of sentencing must consider issuing an order restraining the defendant from any contact "with a victim of the crime" or "with a percipient witness to the crime if it can be established by clear and convincing evidence that the witness has been harassed, as defined in paragraph (3) of subdivision (b) of

74

Section 527.6 of the Code of Civil Procedure, by the defendant." (§ 136.2, subd. (i)(1), (2).)

Vanessa was not a victim of any of the crimes for which defendant was convicted, nor is there evidence in the record that she was a percipient witness to any of defendant's crimes. During the trial, Vanessa testified that she gave an investigator with the District Attorney's office defendant's iPhone password. Vanessa told defendant over the phone that she had given the District Attorney his password. Defendant got angry with her, saying that could "fuck up everything" for him. After Vanessa testified, the trial court was concerned that defendant may have intimidated her by his comment, so it issued a six-month protective order for her benefit pursuant to section 136.2.

Nothing in the trial court's action, however, established that Vanessa was a victim of defendant's crimes or a percipient witness to them. Hence, the court was without authority at sentencing to order a second protective order for her benefit. We will direct the trial court to vacate the protective order.

C.    Senate Bill No. 1393

Defendant contends we should remand the case for the trial court to consider dismissing the five-year enhancement it imposed under section 667, subdivision (a) for a prior serious felony conviction. At the time of sentencing, the trial court had no discretion to strike the enhancement. (See former § 1385, subd. (b) [Stats. 2014, ch. 137, § 1].) While this appeal was pending, however, the Governor signed into law Senate Bill No. 1393 (Senate Bill 1393), which granted trial courts the discretion not to impose the enhancement. (Stats. 2018, ch. 1013, §§ 1, 2, amending §§ 667, subd. (a) and 1385.) The act was effective January 1, 2019.

There is no dispute Senate Bill 1393 applies retroactively to defendant. (*People v. Jones* (2019) 32 Cal.App.5th 267, 272.) But remand is not automatic. Remand is not required where " 'the record shows that the trial court clearly indicated when it originally

sentenced the defendant that it would not in any event have stricken [the] . . . enhancement' even if it had the discretion. [Citation.] [¶] The trial court need not have specifically stated at sentencing it would not strike the enhancement if it had the discretion to do so. Rather, we review the trial court's statements and sentencing decisions to infer what its intent would have been." (*Id.* at pp. 272-273.)

Reviewing the record, we conclude the trial court did not clearly indicate it would not have stricken the enhancement if it had the discretion to do so. True, the court denied defendant's motion to strike his prior strike, and it sentenced him to the upper term on the counts for forcible sodomy (the principal term), forcible rape, and forcible oral copulation. However, for the witness dissuasion count and the great bodily injury enhancements found true on three of the corporal injury counts, the court had discretion not to impose the middle term. The court nonetheless imposed the middle term on each.

In light of the trial court's exercise of discretion not to impose the longest term possible, we cannot declare that the trial court clearly indicated when it originally sentenced defendant it would not in any event have stricken the enhancement for the serious felony prior. By choosing the middle term when it did, the court imposed a sentence that was three years shorter than the maximum sentence it could have imposed. (§§ 136.1, subd. (c)(1); 12022.7, subd. (e).) We cannot say the court would not have reduced the aggregate sentence of 86 years plus 14 years to life by five years had it had the discretion not to impose sentence on the serious felony prior.

We will remand to allow the court to exercise its discretion on this issue.

D.    Youth offender parole

Prior to sentencing, defense counsel submitted a brief asking the trial court to consider that defendant may in the future qualify for participation in youth offender parole. At sentencing, counsel admitted that defendant did not qualify for youth offender parole as presently written because he has a prior strike. But counsel asked the court to

accept its briefing because a number of court cases had challenged aspects of the program, and the statute had already been amended and theoretically could be amended again such that defendant would qualify.

The trial court accepted the briefing, but it declared that defendant did not qualify for youth offender parole. By statute, persons convicted pursuant to the Three Strikes Law such as defendant are ineligible for youth offender parole. (§ 3051, subd. (h).)

Before us, defendant contends that the exclusion of nonhomicide strike defendants from youth offender parole violates equal protection guarantees. He claims no rational purpose supports the Legislature's determination to deny youth offender parole to one-strike sex offenders like him but to grant it for murderers who have no prior strikes.

Defendant did not raise this argument to the trial court. He thus has forfeited it here. (See *People v. Alexander* (2010) 49 Cal.4th 846, 880, fn. 14 [equal protection claim not raised in the trial court is forfeited on appeal].)

### E. Senate Bill No. 567 and Assembly Bill No. 124

Defendant contends we should remand the matter for the court to reconsider the upper term sentencing on counts 2, 21, and 22, forcible sodomy, forcible rape, and forcible oral copulation, respectively. While this appeal was pending, the Governor signed into law two bills that restrict a trial court's authority to sentence a defendant to the upper term. Senate Bill No. 567 (Senate Bill 567) and Assembly Bill No. 124 became effective on January 1, 2022. Both proposed similar but not identical amendments to section 1170. Because Senate Bill 567 bears the highest chapter number, its amendments to section 1170 prevail over those made by Assembly Bill No. 124. (*People v. Jones* (2022) 79 Cal.App.5th 37, 44, fn. 11.)

Senate Bill 567 amended section 1170 to require a court, in its sound discretion, to sentence a defendant to the middle term where the statute specifies three possible terms. The court may sentence a defendant to the upper term only where there are justifying

77

circumstances in aggravation, and the facts underlying those circumstances, except for prior convictions, have either been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial. (§ 1170, subd. (b)(1)-(3).)

Senate Bill 567 also requires a trial court, unless contrary to the interests of justice, to impose the lower term where, among other possibilities, the defendant was under the age of 26 when he committed the crime, and that fact was a contributing factor in the commission of the offense. (§ 1170, subd. (b)(6)(A), (B).)

Defendant contends that both of these amendments to section 1170 are retroactive, and that he qualifies for relief under each. The Attorney General agrees that defendant is entitled to the benefit of the amendment to subdivision (b)(6), and remand is required. The trial court may also consider the amendment to subdivisions (b)(1) and (b)(3) on remand. We agree that remand is required.

Senate Bill 567 is retroactive. Amendments to statutes that reduce the punishment for a specific crime apply to defendants whose judgments are not final on the amendment's operative date unless the Legislature indicates otherwise. (*In re Estrada* (1965) 63 Cal.2d 740, 744.) Defendant's judgment is not final, the amendments are in effect, and there is no evidence the Legislature did not intend for them to apply in this instance.

Defendant was 25 years old at the time of the offenses. Because of defendant's youth, subdivision (b)(6) of section 1170 requires the trial court to impose the lower term on counts 2, 21, and 22 if defendant's age was a contributing factor in his commission of the offenses, and if imposing the lower term would not be contrary to the interests of justice. We must, therefore, remand this matter for the trial court to consider resentencing defendant on those counts.

We need not address Senate Bill 567's other amendments to section 1170 because on remand, the trial court may consider all of its prior sentencing decisions under Senate Bill 567. (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425.)

We will remand to allow the trial court to exercise its discretion under the new legislation.

## DISPOSITION

The matter is remanded with directions to stay execution of sentences on counts 18 and 20 pursuant to section 654, vacate the post-trial protective order issued for the benefit of Vanessa, consider pursuant to Senate Bill 1393 whether not to execute sentence for a serious felony prior found true under section 667, subdivision (a), and consider resentencing defendant on counts 2, 21, and 22 pursuant to the current version of section 1170 as well as any other changes in the sentencing law that may apply to defendant. In all other respects, the judgment is affirmed. The trial court clerk is directed to prepare and file a revised abstract of judgment with the Department of Corrections and Rehabilitation.


            _____

            HULL, Acting P. J.


We concur:


_____

MAURO, J.


_____

DUARTE, J.